703 A.2d 1008

TAMICA JONES AND KATRINA WIGGS, PLAINTIFFS–RESPONDENTS/CROSS–APPELLANTS, v. LASHARRA D. BENNETT, WILLIAM R. HOOVER, CITICORP ACCEPTANCE CO., CHRISTOPHER P. FLYNN AND ENERGY SOLUTIONS, INC., HYUNDAI, INC., HYUNDAI MOTOR AMERICA, CIRCLE CHEVROLET CO., INC., SUCCESSOR TO EATONTOWN HYUNDAI, INC., JOHN DOE 1–10 AND ABC CORPORATION 1–10, DEFENDANTS.

LASHARRA D. BENNETT, PLAINTIFF–RESPONDENT/CROSS–APPELLANT. v. WILLIAM R. HOOVER, ENERGY SOLUTIONS, INC., CITICORP ACCEPTANCE CO., CIRCLE CHEVROLET CO., INC., SUCCESSOR TO EATONTOWN HYUNDAI, INC., JOHN DOE 1–10 AND ABC CORPORATION 1–10 (FICTITIOUS INDIVIDUALS AND CORPORATE ENTITIES) JOINTLY AND/OR INDIVIDUALLY, DEFENDANTS–APPELLANTS.

PAUL BROWN, PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. LASHARRA D. BENNETT, ENERGY SOLUTIONS, INC., WILLIAM HOOVER, CIRCLE CHEVROLET COMPANY, INC., SUCCESSOR TO EATONTOWN HYUNDAI, INC., JOHN DOE 1–10 AND ABC CORPORATION 1–10 (FICTITIOUS INDIVIDUALS AND CORPORATE ENTITIES), JOINTLY AND/OR INDIVIDUALLY, DEFENDANTS.

CHRISTOPHER P. FLYNN, PLAINTIFF, v. WILLIAM R. HOOVER, CITICORP ACCEPTANCE COMPANY AND LASHARRA D. BENNETT, DEFENDANTS.

WILLIAM R. HOOVER, PLAINTIFF–APPELLANT/CROSS–RESPONDENT, v. LASHARRA D. BENNETT, CHRISTOPHER FLYNN, HYUNDAI, INC., CIRCLE CHEVROLET CO., SUCCESSOR TO EATONTOWN HYUNDAI, INC., JOHN DOE 1–10 AND ABC CORPORATION 1–10 (FICTITIOUS INDIVIDUALS AND CORPORATE ENTITIES), DEFENDANTS.

TAMIKA HOBBS, AN INFANT BY RENEE HOBBS AND RENEE HOBBS, INDIVIDUALLY, PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. LASHARRA D. BENNETT, WILLIAM R. HOOVER, CITICORP ACCEPTANCE CO., CHRISTOPHER P. FLYNN, ENERGY SOLUTIONS, INC., HYUNDAI, INC, HYUNDAI MOTOR AMERICA, INC., CIRCLE CHEVROLET CO., INC., SUCCESSOR TO EATONTOWN HYUNDAI, INC., DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Submitted November 18, 1997—Decided January 8, 1998.

Before Judges LONG, STERN and KLEINER.

*Boglioli, O'Mara & Mirra,* attorneys for appellants/cross-respondents William R. Hoover and Energy Solutions, Inc. (*Richard J. Mirra,* on the briefs).

*Karasic, Stone & Marvel* and *Kim A. Fellenz,* attorneys for respondent/cross-appellant Lasharra D. Bennett (*Richard D. Stone* and *Mr. Fellenz,* on the briefs).

*Drazin & Warshaw,* attorneys for respondent/cross-appellant Paul Brown (*Christopher R. Brown,* on the brief).

*Wilentz, Goldman & Spitzer*, attorneys for respondents/ cross-appellants Tamica Jones and Katrina Wiggs (*Randall J. Richards*, of counsel; *John Anzalone*, on the brief).

*Ravich, Koster, Tobin, Oleckna, Reitman & Greenstein*, attorneys for respondent/cross-appellant Tamika Hobbs (*Howard N. Wiener*, on the brief).

The opinion of the court was delivered by

STERN, J.A.D.

This appeal and the cross-appeals are from judgments for plaintiffs (including Lasharra D. Bennett ("Bennett")) following a multiple vehicle accident that occurred on the Garden State Parkway ("Parkway") at approximately 1:15 a.m. on November 10, 1990. Defendant William R. Hoover ("Hoover" or "defendant") was operating a 1988 Ford Ranger leased by defendant Energy Solutions, Inc. ("Solutions") when it struck a 1990 Hyundai automobile owned and operated by Bennett after the Bennett vehicle broke down on the local lanes of the Parkway. Hoover's vehicle then crossed over the median into the express lane where it collided with a second vehicle operated by Christopher P. Flynn ("Flynn"). Bennett and her passengers, Tamika Hobbs ("Hobbs"), Katrina Wiggs ("Wiggs"), Tamica Jones ("Jones") and Paul Brown ("Brown"), filed separate actions for the injuries caused by the accident. Flynn also brought an action.[1]

The complaints were consolidated for trial on the issue of liability. Damages were stipulated at $560,000 because Hoover had filed for bankruptcy protection and the automatic bankruptcy stay was released to the extent Solutions' carrier provided $500,000 liability insurance coverage for him as an additional insured. In a separate declaratory judgment action, Providence Washington Insurance Co., the carrier for the automobile's lessor, was ordered to provide an additional $30,000. Bennett's carrier also

---

[1] There is no issue raised as to Flynn.

provided $30,000 of coverage. The plaintiffs stipulated to a percentage division of the proceeds.

After the trial judge directed a verdict of liability against Hoover and ruled that the passengers' comparative negligence was not to be an issue for its consideration, the jury unanimously found no negligence on the part of Bennett. Judgment was entered against defendant in favor of all plaintiffs including Bennett. Prejudgment interest was denied as was a motion for a new trial.[2]

## I.

Bennett was the owner and operator of an automobile that "broke down" or "slow[ed] down rapidly" and "shut off" unexpectedly and "coasted" to "a complete stop" in the center lane of the three "local lanes" of the Parkway. Shortly after Bennett's vehicle came to a stop, it was struck in the rear by a pick-up truck driven by Hoover which had been leased by his employer, Solutions. Plaintiffs Jones, Wiggs, Brown and Hobbs were passengers in Bennett's vehicle. After striking the Bennett vehicle from behind, Hoover's truck careened to the left, crossed a grass median, entered the parallel southbound "express lanes" of the Parkway, and struck a vehicle being driven by Flynn. Hoover could not recall the accident nor the events that led up to the accident due to the amnesia he sustained from his injuries as a result of the accident.

Plaintiffs in the Bennett vehicle recalled the accident and the events leading up to it in varying details. They decided to go to the Amboy Cinemas to watch the last showing of "Child's Play II" on the evening of November 9, 1990. According to the *Asbury Park Press* movie table introduced into evidence, the movie's last showing for that evening was scheduled to start at 12:30 a.m.

---

[2] A transcript of the new trial motion has not been presented to us. The record reflects an order denying plaintiff's application for prejudgment interest "on moving papers."

When they arrived, plaintiffs were turned away because "the tickets were sold out." Hobbs utilized the theater's restroom for a few minutes while the others waited. The group then went to a restaurant next door, but it was closed. In total, they "remained at the scene" or in the area of the theater for fifteen to twenty minutes. They then decided to "go back home."

As she was driving south on the Parkway, Bennett testified that she heard a "grinding sound coming from the front of [her] car." Upon hearing the noise, she moved from the left lane to the center lane in an effort to eventually get to the right shoulder. However, because traffic in the right lane was heavy, Bennett remained in the center lane when the vehicle came to a complete stop. Bennett testified that she "noticed that the car was having some difficulty. So, immediately I put the flashers on so that I could get all the way over to ... the shoulder." Other passengers corroborated that the flashers or hazard lights were turned on.

Brown estimated that about "five seconds" passed between the time the Bennett vehicle came to a complete stop and when it was hit from behind by the Hoover vehicle. Hobbs estimated the time between the stop and accident "wasn't even a minute."

New Jersey State Trooper Richard Hogan was dispatched to the scene at 1:15 a.m. He indicated that the weather was "clear," traffic was "light," and that this particular area where this accident occurred was "dark" due to an absence of highway lights. Hogan further testified that he found Bennett's vehicle disabled in the southbound left local lane and found the Hoover vehicle in the left express lane adjacent to Flynn's vehicle which was positioned "against the guardrail." He also said that none of the vehicles appeared to have been moved before he arrived.

Trooper Hogan's investigation of the accident scene, which included observations of the debris in the roadway, skid marks and statements of the parties, led him to conclude that Bennett's vehicle was stopped when it was hit by Hoover's vehicle. Hoover was unable to explain what had happened due to his injuries. Trooper Hogan measured 105 feet of skid marks on the road

leading from where Bennett's vehicle was initially struck to where he observed it. He observed no skid marks prior to the point of impact. He also identified an additional 44 feet of skid marks across the grassy median to the point of Hoover's collision with the Flynn vehicle.

Nicholas Bellizzi, a professional engineer, testified for plaintiffs as a motor vehicle accident reconstruction expert. Bellizzi calculated Hoover's speed to be approximately 87.46 miles per hour.

After all the evidence was presented, the trial judge took the issue of the passengers' comparative negligence from the jury and found that Hoover was negligent as a matter of law. The judge instructed the jury:

> that there is at least some negligence and proximate causation attributable to Mr. Hoover. That under the facts in the case, that that is a finding of the Court.
>
> So you need not worry about the issue of whether he was negligent or not. The only issue that you may reach is to what degree he [was] negligent compared with [Ms. Bennett].
>
> The Court has also ruled that there has been no evidence of negligence by any of the passengers of the vehicle ... [and] no evidence of negligence on their part.
>
> So the only issues you will be considering is whether Ms. Bennett was negligent and if she was negligent what was the relative negligence of the two parties, as between her and Mr. Hoover.

In his final instructions, the judge charged the jury on its responsibility to decide whether Bennett was negligent and, if so, the "relative percentage of negligence" of Bennett and Hoover.[3] By a vote of 6–0, the jury responded "no" to the question "[w]as the defendant, LaSharra Bennett negligent, which negligence was a proximate cause of the accident."

## II.

Hoover and Solutions argue that the trial court inappropriately removed from the jury the issue of comparative negligence as it related to the passengers in the Bennett vehicle. They further claim that the issue of proximate cause was also a jury question

---

[3] The judge also charged as to the impact of Bennett's knowledge of any defects with her car.

"in that plaintiffs would not have been injured 'but for' their failure to alight from the disabled vehicle." They cite *Polistina v. Polistina,* 183 *N.J.Super.* 291, 443 *A.*2d 1086 (App.Div.1982), for the proposition that "[t]he passengers' duty to attend to their own safety translates into a duty to alight from a vehicle disabled in a location that exposes its occupants to extreme danger."

The applicable standard in deciding a motion for directed verdict requires that the trial judge "evaluate all the evidence in the light most favorable to the non-moving party." *Caterinicchio v. Pittsburgh Corning Corp.,* 127 *N.J.* 428, 437, 605 *A.*2d 1092 (1992) (citing *Dolson v. Anastasia,* 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969)); *see also Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 536, 666 *A.*2d 146 (1995).

Here, defendants argue that the trial judge's determination that there was no testimony that the Bennett vehicle was stopped long enough to raise a jury issue as to comparative negligence pertaining to the passengers (excluding Bennett) overlooked the fact that plaintiffs gave varying testimony giving rise to different inferences regarding how long the car was stopped on the highway and how long the passengers remained therein before the accident. Defendants point to "[t]he undisputed fact" that places of "safe haven" were close at hand, and that plaintiffs "easily could have alighted from the disabled vehicle and removed themselves to a place of safety."

We agree with the trial judge that the evidence did not present a genuine issue of comparative negligence as applied to the passengers, substantially for the reasons given by the judge. Irrespective of the differences in the testimony as to when the movie was scheduled to start and when the group left the theater area, there was no evidence by which the jury could reasonably conclude that the Bennett vehicle was stranded for any longer than a short period before getting hit by Hoover. Hoover's amnesia prevented him from testifying and he presented no evidence to the contrary. Moreover, given the fact that Bennett's vehicle was at a complete stop in the middle of the Garden State

Parkway, it seems unreasonable to expect the passengers to exit the vehicle to get to a "safe haven" in the middle of the night in the time they had. *Cf. Polistina, supra,* 183 *N.J.Super.* 291, 443 *A.*2d 1086 (where the vehicle may have been stopped partially on the shoulder of the highway, the driver exited the vehicle, and the passengers remained therein at least for "a few minutes" on a rainy or "misty" night). In any event,

[i]t is elementary that a following car in the same lane of traffic is obligated to maintain a reasonably safe distance behind the car ahead ... [and][f]ailure to do so resulting in a collision, is negligence, and a jury should be so instructed.

[*Dolson, supra,* 55 *N.J.* at 10, 258 *A.*2d 706.]

As in *Dolson,* here "there was no sufficient evidence of contributory negligence on the part of [the passenger plaintiffs] which proximately contributed to the collision." *Id.* at 11, 258 *A.*2d 706. Like the plaintiff in *Dolson,* the passengers here did not in any way either contribute to the accident or contribute to their injuries by merely remaining in the vehicle for a short period after the car broke down. Hence, the issue of the comparative negligence of the passengers in the Bennett vehicle was properly removed from the jury's consideration.

Defendants also argue that the trial court erroneously directed a verdict against Hoover as to the passengers and improperly charged the jury on Bennett's claim because there was ample evidence to support the inference that Bennett's negligence contributed to the accident and because Hoover was confronted with a "sudden emergency" caused by Bennett.

 It is well established that "the violation of motor vehicles statutes is evidence of negligence." *Paiva v. Pfeiffer,* 229 *N.J.Super.* 276, 280, 551 *A.*2d 201 (App.Div.1988). "However, where a motor vehicle statute codifies the common law standard, the violation of the statute is not evidence of negligence, it is negligence." *Ibid.* (citing *Dolson, supra,* 55 *N.J.* at 10, 258 *A.*2d 706). Thus, the failure to maintain a reasonably safe distance behind the vehicle ahead resulting in a collision is negligence as a matter of law, and a jury should be so instructed. *Dolson, supra,* at 10, 258

A.2d 706; *see also Eaton v. Eaton,* 119 *N.J.* 628, 642–43, 575 *A.*2d 858 (1990); *Paiva, supra,* 229 *N.J.Super.* at 279–80, 551 *A.*2d 201. In *Paiva* we stated that "[i]t is beyond dispute that had [defendant] rear-ended the [vehicle] he was following the *Dolson* charge would have been totally appropriate." *Id.* at 282, 551 *A.*2d 201.

We thus agree with the trial judge's conclusion in this case:

if this isn't a case that fits within *Dolson versus Anastasia,* I don't know what is. . . . If [they] were sitting there on the highway, stopped when he came along, flashers or no flashers, he had plenty of time to see them. Even if they stopped in front of him, *Dolson* . . . covers that. You're supposed to maintain a safe following distance so that even if someone does do a sudden stop, you're able to avoid them. .

Even two to five seconds for a fully stopped vehicle . . . is plenty of time to avoid the vehicle. . . .

Under *Dolson* . . . there is more than enough time for a following vehicle to avoid them there, especially when there is no traffic in either other lane.

I can't see any scenario under which a reasonable jury could not find Mr. Hoover to be negligent. So, therefore, I would have to enter a directed verdict of negligence as to Mr. Hoover and no comparative negligence as to the passengers.

■ Defendants' argument that Hoover was confronted with a "sudden emergency" caused by Bennett is also unpersuasive. *See Finley v. Wiley,* 103 *N.J.Super.* 95, 103, 246 *A.*2d 715 (App.Div. 1968) ("defendant was faced with no more than an everyday traffic problem for which he should have been prepared"). Defendants' reliance upon *La Mandri v. Carr,* 148 *N.J.Super.* 566, 372 *A.*2d 1327 (App.Div.1977), is misplaced. There we found "no evidence of any 'tailgating' by plaintiff prior to defendant's loss of control of his vehicle" and therefore concluded that the trial court improperly instructed the jury about the tailgating statute. *Id.* at 572–73, 372 *A.*2d 1327. Here, however, there was evidence Hoover was driving well above the posted speed limit on the Garden State Parkway when he hit a car that broke down in his lane of traffic. "To invoke the sudden emergency doctrine and to be entitled to that charge to the jury, a party must have been confronted by a sudden emergency over which he had no control, without fault on his part." *Roberts v. Hooper,* 181 *N.J.Super.* 474, 478, 438 *A.*2d 351 (App.Div.1981). Accordingly, failure to maintain a reasonable following distance warranted a *Dolson* charge.

### III.

On their cross-appeal, plaintiffs argue that defendants' insurance carrier should have been required to pay prejudgment interest under *R.* 4:42–11(b). The trial judge denied the application, holding that "this court cannot use policy considerations to override the clear mandate of the Supreme Court decision" in *Kotzian v. Barr*, 81 *N.J.* 360, 408 *A.*2d 131 (1979).[4] While defendant's policy provided that "Our payment of the LIABILITY INSURANCE limit ends our duty to defend or settle," plaintiffs contend that the factual circumstances in this case are "clearly distinguishable" from *Kotzian*, *supra*, which held that the payment of prejudgment interest was not required in a case involving payment of the policy limits.

In *Kotzian*, *supra*, the plaintiffs made unreasonable settlement demands because they demanded prejudgment interest of about $100,000 while the defendant's carrier offered a settlement of the $15,000 policy limits. *See* 81 *N.J.* at 360–61, 364–65, 408 *A.*2d 131. The Court found that prejudgment interest was not warranted, stating:

> Were policy limits not involved, we would have little difficulty in concluding that prejudgment interest should be assessed in this case. Surely ... [the insurance company] could have immediately deposited the policy limits into court, as it eventually did. However, we are not prepared to say that [the insurance company's] failure to have made earlier deposit of its full policy limits, having sought early in the proceedings to make the money available to plaintiffs by its offer, should result in the company's being required to pay over and above the amount contracted for with its assured. This is not to say that the insurance contract is so sacrosanct that misconduct or bad faith on the part of the carrier would protect it against a claim for prejudgment interest over its policy limits; but that is not the case here....

> [*Id.* at 367, 408 *A.*2d 131 (internal citations omitted).]

---

4 Although the papers submitted on the motion for prejudgment interest are not before us, plaintiffs suggest that unless prejudgment interest is awarded there would be no incentive for carriers to offer policy limits before the date of trial, while they make interest on their money, and that *R.* 4:42–11(b) is designed to encourage early settlement.

Thus, the Supreme Court majority held that there was "no mistaken exercise of the trial court's discretion" by denying prejudgment interest under the circumstances. *Ibid.*

Here, we are told the policy limits were ultimately offered in settlement by Hoover's carrier, but the record before us reveals little regarding what was offered, and when, before the matter was tried as to liability. Apparently, no policy proceeds were paid into court. In fact, it is unclear from what is before us whether the policy limits were offered to settle the case or that the parties merely agreed to stipulate damages and a division of the policy proceeds contingent on the jury's findings as to liability. Moreover, we have no record as to the impact the bankruptcy proceedings involving Hoover,[5] and the declaratory judgment action regarding which carrier had primary liability, may have had on the timing of a settlement offer. In any event, we do not read the Supreme Court majority in *Kotzian* as barring prejudgment interest no matter when the policy limits are offered or how late that offer may be made before trial—irrespective of the merits of the defense—merely because the verdict exceeded the "amount [the carrier] contracted with its assured." 81 *N.J.* at 367, 408 *A.2d* 131.[6] *Cf. Heim v. Wolpaw,* 271 *N.J.Super.* 538, 542–44, 638 *A.2d* 1373 (App.Div.), ("prejudgment interest should not have been awarded except for the period from the commencement of the action until appellant deposited the limit of its policy in court and offered it to plaintiffs in settlement of their claims against the insureds"), *certif. denied,* 137 *N.J.* 316, 645 *A.2d* 143 (1994).

---

[5] The order of the bankruptcy court in the record before us is undated and refers to this case as involving a "pre-petition personal injury" claim.

[6] Defendant points to Pressler, *Current N.J. Court Rules,* comment 2 on *R.* 4:42–11(b), as stating that the rule of *Kotzian* absolutely prohibits the award of prejudgment interest "to the extent that such interest would increase its maximum contractual obligation under the policy." We do not so read the comment which states: "[d]espite the interest requirement of the rule, a carrier *has been held* not to be under obligation to pay prejudgment interest to the extent that such interest would increase its maximum contractual obligation under the policy," citing *Kotzian* (emphasis added).

*R.* 4:42–11(b) provides that prejudgment interest shall be awarded in tort actions except "that in exceptional cases the court may suspend the running of such prejudgment interest." On the other hand, the impact of the policy limits, the stay of the bankruptcy court and the declaratory judgment proceedings must be considered in this context. The judge's ruling on prejudgment interest must be reconsidered under the facts of the case.

## IV.

Accordingly, we remand for reconsideration and a statement of the reasons on plaintiff's application for prejudgment interest.

The judgment is affirmed on defendant's appeal, and we remand for reconsideration of the issue of prejudgment interest raised on plaintiffs' cross-appeal. We do not retain jurisdiction.