714 A.2d 924 (1998)
155 N.J. 330
J.S. and M.S., his wife, as Natural Parents and Guardians Ad Litem of C.S., A Minor, and M.S., A Minor, and M.S., individually, Plaintiffs-Respondents,
v.
R.T.H., Defendant, and
R.G.H., his wife, jointly and severally Defendant-Appellant.
Supreme Court of New Jersey.
Argued February 3, 1998.
Decided July 29, 1998.
*926 Patricia M. Forsyth, Secaucus, for defendant-appellant (Waters, McPherson, McNeill, attorneys; Kenneth D. McPherson, Jr., of counsel; Ms. Forsyth and Brian D. Lieberman, on the briefs).
Marian I. Kelly, Woodbury, for plaintiffs-respondents (Hoffman, DiMuzio and Hoffman, attorneys).
*925 The opinion of the Court was delivered by HANDLER, J.
In this case, two young girls, ages 12 and 15, spent substantial periods of recreational time with their neighbor at his horse barn, riding and caring for his horses. Betraying the trust this relationship established, the neighbor, an older man, sexually abused both girls for a period of more than a year. Following the man's conviction and imprisonment for these sexual offenses, the girls, along with their parents, brought this action against the man and his wife for damages, contending that the wife's negligence rendered her, as well as her husband, liable for their injuries. The man conceded liability for both the intentional and negligent injuries that he inflicted on the girls by his sexual abuse. His wife, however, denied that, under the circumstances, she could be found negligent for the girls' injuries.
This case presents the issue of whether a wife who suspects or should suspect her husband of actual or prospective sexual abuse of their neighbors' children has any duty of care to prevent such abuse. And, if there is such a duty, does a breach of that duty constitute a proximate cause of the harm that results from sexual abuse.

I
Defendants R.T.H. and R.G.H., husband and wife (called "John" and "Mary" for purposes of this litigation), moved into a house in Vineland, New Jersey, and became next-door neighbors of plaintiffs, J.S. and M.S. and their two daughters, C.S. and M.S.
John, 64 years old, was charged with sexually assaulting the two sisters over a period of more than a year. He pled guilty to endangering the welfare of minors and was sentenced to eighteen months in state prison. Plaintiffs, as the natural parents and guardians ad litem of their two daughters, filed a complaint against John alleging intentional, reckless, and/or negligent acts of sexual assault against each of the two girls. In an *927 amended complaint, plaintiffs added Mary as a defendant, alleging that she "was negligent in that she knew and/or should have known of her husband's proclivities/propensities" and that as a result of her negligence the two girls suffered physical and emotional injury.[1]
Defendants filed a joint answer in which they denied plaintiffs' allegations. In an amended answer, Mary offered the defenses that she owed no duty to plaintiffs, that any alleged negligence on her part was not the proximate cause of any injuries or damages sustained by plaintiffs, and that any damages sustained by plaintiffs were the result of actions by a third party over whom she exercised no control. Mary also filed a crossclaim for contribution and indemnification against John, alleging that even if plaintiffs' allegations were proven, John was the primary, active, and sole culpable cause of any injuries to the plaintiffs.
Mary filed a motion for summary judgment, contending that there was no legal basis for finding her negligent. In opposition, plaintiffs submitted the certifications of the two minor plaintiffs. Plaintiffs also argued that the summary judgment motion was premature, in that they had not yet had the opportunity to depose John, who was still incarcerated, nor had they completed other discovery.
The trial court entered summary judgment on behalf of Mary.[2] On appeal, the Appellate Division reversed the order and remanded for entry of an order granting plaintiffs extended discovery. 301 N.J.Super. 150, 693 A.2d 1191 (1997).
This Court granted defendant's petition for certification. 151 N.J. 464, 700 A.2d 876 (1997).
On this appeal, we assess the sufficiency of the evidence under the standard applicable to summary judgments. Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995). Under that standard, the court accepts as true all the evidence and favorable legitimate inferences that support the non-moving party. Id. at 523, 666 A.2d 146.
The summary judgment record, which includes plaintiffs' certifications and Mary's deposition testimony, indicates that after defendants moved next door to plaintiffs in 1988, the two families quickly became friendly and spent a lot of time together. Defendants owned horses and a barn, and, at John's encouragement, the minor plaintiffs visited daily to ride horseback and to help care for the horses. Additionally, John would take at least the older of the two girls horseback riding on various trails in New Jersey and Pennsylvania. Usually John was the only adult in their company; Mary never joined the trio. However, during the summer of 1992, there were several occasions when Mary entered the barn, saw John with the girls, and stated to him: "Oh. Your whores are here." On several occasions that summer when the girls were on the property riding horses, Mary yelled to them from one of the windows of the house: "You bitches." Nevertheless, Mary never "confronted" her husband about the time he was spending alone with either or both of the girls.
The sexual assaults occurred over a period of a year, from 1991 until John's arrest in November 1992. Additional evidence indicates that for at least some period in 1992, Mary lived outside of the marital home. It was not until November 1992, when her son informed her of John's arrest, that Mary first learned that her husband had had any sexual contact with the girls. Mary was shocked by the news; she had believed her husband and the girls were just friends who spent time together because of the horses. She saw *928 John the next day, following his release from prison. He told her that the police, acting on information received in a phone call, had caught him behind the house with the two girls. Both at the trial level and on appeal, however, Mary conceded for the purposes of argument that "at all relevant times" she "knew or should have known of her husband's proclivities/propensities."

II

A.
In determining whether a duty is to be imposed, courts must engage in a rather complex analysis that weighs and balances several, related factors, including the nature of the underlying risk of harm, that is, its foreseeability and severity, the opportunity and ability to exercise care to prevent the harm, the comparative interests of, and the relationships between or among, the parties, and, ultimately, based on considerations of public policy and fairness, the societal interest in the proposed solution. See Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (1993).
Foreseeability of the risk of harm is the foundational element in the determination of whether a duty exists. See Williamson v. Waldman, 150 N.J. 232, 239, 696 A.2d 14 (1997). The "[a]bility to foresee injury to a potential plaintiff" is "crucial" in determining whether a duty should be imposed. Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc., 135 N.J. 182, 194, 638 A.2d 1288 (1994).
Foreseeability as a component of a duty to exercise due care is based on the defendant's knowledge of the risk of injury and is susceptible to objective analysis. Weinberg v. Dinger, 106 N.J. 469, 484-85, 524 A.2d 366 (1987). That knowledge may be an actual awareness of risk. Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 576-77, 675 A.2d 209 (1996). Such knowledge may also be constructive; the defendant may be charged with knowledge if she is "in a position" to "discover the risk of harm." Id. at 578, 675 A.2d 209. In some cases where the nature of the risk or the extent of harm is difficult to ascertain, foreseeability may require that the defendant have a "special reason to know" that a "particular plaintiff" or "identifiable class of plaintiffs" would likely suffer a "particular type" of injury. See People Express Airlines, Inc. v. Consolidated Rail Corp., 100 N.J. 246, 262, 263, 495 A.2d 107 (1985). Further, when the risk of harm is that posed by third persons, a plaintiff may be required to prove that defendant was in a position to "know or have reason to know, from past experience, that there [was] a likelihood of conduct on the part of [a] third person[]" that was "likely to endanger the safety" of another. Clohesy v. Food Circus Supermarkets, Inc., 149 N.J. 496, 507, 694 A.2d 1017 (1997) (internal quotation and citation omitted).
"[T]he question whether there is a `duty' merely begs the more fundamental question whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." Weinberg, supra, 106 N.J. at 481, 524 A.2d 366 (internal quotation and citation omitted). The imposition of a duty thus requires an evaluation and a balancing of the conflicting interests of the respective parties. Portee v. Jaffee, 84 N.J. 88, 101, 417 A.2d 521 (1980). That assessment necessarily includes an examination of the relationships between and among the parties. Also implicated in this analysis is an assessment of the defendant's "responsibility for conditions creating the risk of harm" and an analysis of whether the defendant had sufficient control, opportunity, and ability to have avoided the risk of harm. Kuzmicz v. Ivy Hill Park Apts., Inc., 147 N.J. 510, 515, 688 A.2d 1018 (1997); Carvalho, supra, 143 N.J. at 573, 675 A.2d 209.
Ultimately, the determination of the existence of a duty is a question of fairness and public policy. Clohesy, supra, 149 N.J. at 502, 694 A.2d 1017. In fixing the limits of liability as a matter of public policy, courts must draw on "notions of fairness, common sense, and morality." Hopkins, supra, 132 N.J. at 443, 625 A.2d 1110. Public policy must be determined in the context of contemporary circumstances and considerations. See, e.g., Kelly v. Gwinnell, 96 N.J. 538, 544-45, 476 A.2d 1219 (1984) (noting that in a society growing increasingly intolerant of *929 drunken driving, the imposition of a duty on social hosts "seems both fair and fully in accord with the State's policy"). Thus, "`[d]uty' is not a rigid formalism" that remains static through time, but rather is a malleable concept that "must of necessity adjust to the changing social relations and exigencies and man's relation to his fellows." Wytupeck v. Camden, 25 N.J. 450, 462, 136 A.2d 887 (1957).
The Court, in its determination whether to impose a duty, must also consider the scope or boundaries of that duty. See Kelly, supra, 96 N.J. at 552, 476 A.2d 1219 (observing that determination of the scope of duty in negligence cases "has traditionally been a function of the judiciary"). The scope of a duty is determined under "the totality of the circumstances," Clohesy, supra, 149 N.J. at 514, 694 A.2d 1017, and must be "reasonable" under those circumstances, id. at 520, 694 A.2d 1017. Factors to be taken into consideration include the risk of harm involved and the practicality of preventing it. Id. at 529-20, 694 A.2d 1017; see also Hopkins, supra, 132 N.J. at 447, 625 A.2d 1110 (noting that "[n]egligence has often been defined as the failure to take precautions that cost less than the damage wrought" by the harm). When the defendant's actions are "relatively easily corrected" and the harm sought to be prevented is "serious," it is fair to impose a duty. Kelly, supra, 96 N.J. at 549-50, 476 A.2d 1219. In the final analysis, the "reasonableness of action" that constitutes such a duty is "an essentially objective determination to be made on the basis of the material facts" of each case. Weinberg, supra, 106 N.J. at 484, 524 A.2d 366.

B.
Here, a man criminally sexually assaulted unrelated, adolescent children whom he had befriended. The defendant is the spouse of the wrongdoer. The abuse occurred on her own property over an extended period of time. The tortious, assaultive conduct is of a type that is extremely difficult to identify, anticipate, and predict. While these considerations bear on all of the factors that are relevant in determining whether a duty of care should be recognized and imposed on the spouse, they bear materially on the primary element of foreseeability.
Although conduct involving sexual abuse is often secretive, clandestine, and furtive, a number of factors are relevant when determining whether or not it is foreseeable to a wife that her husband would sexually abuse a child. These include whether the husband had previously committed sexual offenses against children; the number, date, and nature of those prior offenses; the gender of prior victims; the age of prior victims; where the prior offenses occurred; whether the prior offense was against a stranger or a victim known to the husband; the husband's therapeutic history and regimen; the extent to which the wife encouraged or facilitated her husband's unsupervised contact with the current victim; the presence of physical evidence such as pornographic materials depicting children and the unexplained appearance of children's apparel in the marital home; and the extent to which the victims made inappropriate sexual comments or engaged in age-inappropriate behavior in the husband and wife's presence. See, e.g., Pamela L. v. Farmer, 112 Cal.App.3d 206, 169 Cal.Rptr. 282 (1980) (finding that foreseeability of harm is great where the sexual assault occurred in the marital home, the child victims were expressly invited into the home by the wife, the wife knew that the husband had molested children in the past, and the wife left the children in the unsupervised presence of her husband); Doe v. Franklin, 930 S.W.2d 921 (Tex.Ct.App.1996) (ruling that foreseeability requirement is met where wife had knowledge that her husband was a pedophile, wife invited child victim into home, child tried to tell the wife of the molestation, and wife left child in the unsupervised presence of the husband); T.A. v. Allen, 447 Pa.Super. 302, 669 A.2d 360, 372 (1995) (Ford Elliot, J., dissenting) (stating that wife owed duty to children where she allowed them to enter into the marital home where she knew that the husband kept a studio devoted to sexual experiments on children), appeal denied, 544 Pa. 661, 676 A.2d 1201 (1996); see also In re Registrant G.B., 147 N.J. 62, 70-71, 685 A.2d 1252 (1996) (listing factors that the Legislature has identified as *930 indicative of the likelihood of a pedophile's re-offense); In re Registrant C.A., 146 N.J. 71, 81-83, 679 A.2d 1153 (1996) (same); Doe v. Poritz, 142 N.J. 1, 15, 662 A.2d 367 (1995) (noting that there is a 10-29% recidivism rate for offenders who sexually assault little girls and a 13-40% recidivism rate for offenders who sexually assault little boys).
Moreover, there is some empirical support for the conclusion that sexual abuse of a child, while extremely difficult to detect or anticipate, is a risk that can be foreseen by a spouse. This evidence indicates that an extremely high percentage of child sexual molesters are men, many of whom are married. U.S. Dept. of Justice, Bureau of Justice Statistics, Child Victimizers: Violent Offenders and Their Victims 5 (March 1996). The vast majority of child victims are female and many child victims fall prey to an immediate relative or a family acquaintance; most of these sexual assaults are committed either in the offender's home or the victim's home. Id. at 10-12. Given those factors, the wife of a sexual abuser of children is in a unique position to observe firsthand telltale signs of sexual abuse. A wife may well be the only person with the kind of knowledge or opportunity to know that a particular person or particular class of persons is being sexually abused or is likely to be abused by her husband. Cf. Franklin, supra, 930 S.W.2d at 928 (concluding that once wife assumed the task of caring for her child and inviting the child into her home, the wife had a duty not to leave the child alone with her pedophiliac husband); Chaney v. Superior Ct., 39 Cal.App.4th 152, 46 Cal.Rptr.2d 73 (1995) (indicating that where a child is sexually assaulted in marital home by husband, wife has a duty of reasonable care if husband's behavior was "reasonably foreseeable").
These considerations warrant a standard of foreseeability in this case that is based on "particular knowledge" or "special reason to know" that a "[p]articular plaintiff" or "identifiable class of plaintiffs" would suffer a "particular type" of injury. See People Express, supra, 100 N.J. at 260, 262, 263, 495 A.2d 107; see also Clohesy, supra, 149 N.J. at 513, 694 A.2d 1017 (holding that liability can be imposed on supermarket for failing to provide security in its parking lot as long as "specificity and strictness [ ] are infused into the definitional standard of foreseeability") (internal quotation and citation omitted); Dunphy v. Gregor, 136 N.J. 99, 109, 642 A.2d 372 (1994) (determining that it was appropriate to allow unmarried cohabitant to recover against defendant motorist under theory of bystander liability because she represented "an eminently foreseeable but clearly discrete class of potential plaintiffs"); Hopkins, supra, 132 N.J. at 451-52, 625 A.2d 1110 (Clifford, J., concurring) (finding it appropriate to impose liability on real estate brokers for injury sustained during open-house as long as the duty to warn and inspect arises only in "severely circumscribed" circumstances that extends only to a "limited class" of plaintiffs); Tarasoff v. Regents of the Univ. of Cal., 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 340 (1976) (imposing a duty of reasonable care under the circumstances when defendant has a basis for determining that a readily identifiable victim is likely to be harmed by the actions of a third person). "Particularized foreseeability" in this kind of case will conform the standard of foreseeability to the empirical evidence and common experience that indicate a wife may often have actual knowledge or special reason to know that her husband is abusing or is likely to abuse an identifiable victim and will accommodate the concerns over the inherent difficulties in predicting such furtive behavior. That test of foreseeability will also ensure that the wife is not subject to a broad duty that may expose her to liability to every child whom her husband may threaten and harm. Foreseeability under that definitional standard is neither unrealistic nor unfair.
The nature of the parties' interests bears on the need to recognize a duty of care. "There can be no doubt about the strong policy of this State to protect children from sexual abuse and to require reporting of suspected child abuse." 301 N.J.Super. at 156, 693 A.2d 1191. That policy is so obvious and so powerful that it can draw little argument. It is an interest that is massively documented.
The Legislature has dealt comprehensively with the subject of child abuse and has enacted *931 a plethora of statutes designed to prevent the sexual abuse of children. For example, N.J.S.A. 9:6-8.10 requires any person having reasonable cause to believe that a child has been subject to abuse to report the abuse immediately to the Division of Youth and Family Services. The duty to report is not limited to professionals, such as doctors, psychologists, and teachers, but is required of every citizen. State v. Hill, 232 N.J.Super. 353, 356, 556 A.2d 1325 (Law Div.1989). Indeed, friends or neighbors are often in the best position to fulfill this statutory duty because they are the people "who frequently hear or observe acts of child abuse." Id. at 357, 556 A.2d 1325. The purpose of the sexual abuse reporting statute is
to provide for the protection of children under 18 years of age who have had serious injury inflicted upon them by other than accidental means. It is the intent of this legislation to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that the legal rights of such children are fully protected.
[N.J.S.A. 9:6-8.8.]
It is a disorderly persons offense to fail to report an act of child abuse reasonably believed to have been committed. N.J.S.A. 9:6-8.14. See F.A. v. W.J.F., 280 N.J.Super. 570, 576, 656 A.2d 43 (App.Div.1995) (noting that any person "who knowingly fails to report an act of child abuse `having reasonable cause to believe an act of child abuse has been committed, is a disorderly person'") (quoting N.J.S.A. 9:6-8.14). Another statute, N.J.S.A. 2A:61B-1a(1), declares that a person who stands in loco parentis to a child and knowingly permits or acquiesces in sexual abuse of the child by another person in the household is also guilty of sexual abuse. Further evidence of the State's continuing concern for children at risk from abuse is N.J.S.A. 9:6-8.75, which establishes the New Jersey Task Force on Child Abuse and Neglect.[3]
"Megan's Law," N.J.S.A. 2C:7-1 to -11, provides yet more evidence of the State's intolerance of sexual abuse of children. In affirming the constitutionality of the community notification and registration requirements of Megan's Law for convicted sex offenders, this Court recognized the enormous public interest in protecting society from the threat of potential molestation, rape, or murder of women and children. See Poritz, supra, 142 N.J. at 13, 662 A.2d 367.
While the interest in protecting children from sexual abuse is great, this Court must also take into consideration defendants' interests in a stable marital relationship and in marital privacy. See State v. Szemple, 135 N.J. 406, 414, 640 A.2d 817 (1994). That interest traditionally found expression in the common-law doctrine of interspousal immunity wherein one spouse could not sue or be *932 sued by another, see generally Kennedy v. Camp, 14 N.J. 390, 396, 102 A.2d 595 (1954); 1 Blackstone Commentaries 442; Prosser, Torts § 122 at 860-64 (4th ed.1971), and the testimonial disqualification wherein one spouse was not permitted to testify for or against the other, see generally Szemple, supra, 135 N.J. at 414, 640 A.2d 817; 1 Coke, A Commentarie upon Littleton 6b (9th ed. 1832); 8 Wigmore on Evidence § 2227 (McNaughton rev.1961). Both courts and scholars, however, increasingly questioned whether the doctrine of marital immunity actually succeeded in promoting the marital tranquility and privacy it was designed to serve. See, e.g., Merenoff v. Merenoff, 76 N.J. 535, 388 A.2d 951 (1978) (abrogating interspousal immunity; also observing that it is hard to "monitor marital morality" and stating: "The threat to domestic harmony posed by a legal action between spouses is an imponderable; the cohesiveness of a marriage may be jeopardized as much by barring a cause of action as by allowing it."). The testimonial disqualification has also been criticized. See 8 Wigmore, supra, § 2228 at 221 (terming the spousal testimonial privilege "the merest anachronism in legal theory and an indefensible obstruction to truth in practice"); 63 American Bar Ass'n Reports 594-95 (1938) (calling for the abolition of the spousal testimonial privilege); Trammel v. United States, 445 U.S. 40, 52, 100 S.Ct. 906, 913, 63 L. Ed.2d 186, 196 (1980) (holding that the rule permitting an accused to bar all adverse spousal testimony cannot stand because the "ancient foundations for so sweeping a privilege have long since disappeared"; and observing that "[w]hen one spouse is willing to testify against the other in a criminal proceedingwhatever the motivationtheir relationship is almost certainly in disrepair; there is probably little in the way of marital harmony for the privilege to preserve").
Moreover, the societal interest in enhancing marital relationships cannot outweigh the societal interest in protecting children from sexual abuse. The child-abuse reporting statute itself has mandated that balanceit applies to every citizen, including a spouse. Supra at 343, 714 A.2d at 931. As the Appellate Division here described, "the Legislature's adoption of that statute [i.e., "Megan's Law"] is an expression of New Jersey's strong public policy favoring protection of children over the privacy of an offending adult." 301 N.J.Super. at 157, 693 A.2d 1191. Thus, "[t]he protective privilege ends where the public peril begins." Tarasoff, supra, 131 Cal.Rptr. 14, 551 P.2d at 347; cf. State v. P.Z., 152 N.J. 86, 112, 703 A.2d 901 (1997) (refusing to extend a parent's right to counsel or right to Miranda warnings under the state and federal constitutions to Title Nine investigations by DYFS workers because that "would shift the primary focus of Title Nine from the right of children to be protected from abuse and neglect to the rights of parents to the custody of their children. Those rights are not in equipoise."). The Appellate Division here also overruled the holding contained in Rozycki v. Peley, 199 N.J.Super. 571, 579, 489 A.2d 1272 (Law Div.1984) to the extent that it "places a higher priority upon preserving the defendants' marital relationship than upon protecting children from abuse." 301 N.J.Super. at 157, 693 A.2d 1191. Thus, while the marital relationship is a genuine concern in this case, it is by no means dispositive.
Considerations of fairness and public policy also govern whether the imposition of a duty is warranted. Carvalho, supra, 143 N.J. at 573, 675 A.2d 209. Public policy considerations based in large measure on the comparative interests of the parties support overwhelmingly the recognition of a duty of care in these circumstances. This Court has recognized that the sexual abuse of children not only traumatizes the victims, but also exacts a heavy toll on society:
Recent research indicates that a number of psychosocial problemsincluding chronic depression and anxiety, isolation and poor social adjustment, substance abuse, suicidal behavior, and involvement in physically or sexually abusive relationships as either aggressor or victimare more common among adults molested as children than among those with no such childhood experiences. Victims of sexual abuse can suffer an impaired ability to critically evaluate the motives and behavior of others, making them more vulnerable to revictimization.

*933 An especially disturbing finding about child sexual abuse is its strong intergenerational pattern; in particular, due to the psychological impact of their own abuse, sexually abused boys have been found to be more likely than non-abused boys to turn into offenders against the next generation of children, and sexually abused girls are more likely to become mothers of children who are abused. And studies show that adult male aggressive behavior, particularly sexual aggression, is associated with the trauma of childhood sexual abuse. Thus, apart from the substantial personal trauma caused to the victims of such crimes, sexual crimes against children exact heavy social costs as well.
[Poritz, supra, 142 N.J. at 16, 662 A.2d 367 (internal quotation and citation omitted).]
In defining the appropriate standard of care, we are enjoined again to consider the comprehensive legislative treatment of the issue of sexual abuse of children. While the efforts of the Legislature to combat sexual abuse of children are considerable, evidence and experience indicate that they may not be sufficient to stem the tide. This is because ninety-five to ninety-eight percent of child sexual abuse "is hidden behind closed doors" and occurs "in the home or within the circle of immediate friends and family." Hearing Before the Senate Institutions, Health and Welfare Committee on Child Abuse and Sexual Abuse of Children in Day and Residential Children's Facilities 39 (Oct. 3, 1984) (statement of Betty Wilson, President of the Center for Non-Profit Corporations). Moreover, "80% of substantiated perpetrators of child sexual abuse have no prior criminal records," id. at 11, 662 A.2d 367 (statement of George Albanese, Commissioner of the New Jersey Department of Human Services), and thus would fall outside of current registration and community notification requirements. Thus, we can confidently conclude that civil remedies will complement statutory protections and further the legislative efforts to enhance the protection of children.
It is obvious that the Legislature, in providing sweeping statutory protections designed to protect children and to curb child abuse, did not intend to foreclose civil remedies. We note that
[w]hen a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.
[Restatement (Second) of Torts, § 874A.]
Not only may a violation of a statute "generate a civil remedy even where no such remedy is included in the act," but the "violation of some statutes may even be negligence." Parks v. Pep Boys, 282 N.J.Super. 1, 14-15, 659 A.2d 471 (App.Div.1995). When a statute specifically incorporates a standard of care, "a jury finding of a statutory violation constitutes a finding of negligence." Eaton v. Eaton, 119 N.J. 628, 642-43, 575 A.2d 858 (1990); see also Jones v. Bennett, 306 N.J.Super. 476, 484, 703 A.2d 1008 (App.Div. 1998) (noting that normally "violation of a motor vehicle statute is evidence of negligence," but where "a motor vehicle statute codifies the common law standard, the violation of the statute is not evidence of negligence, it is negligence") (internal quotation and citation omitted). When a statute, however, merely proscribes conduct and adopts a standard without intending specifically to incorporate the non-statutory or common-law standard, violation of that statute may constitute only evidence of negligence. See Smith v. Young, 300 N.J.Super. 82, 95, 692 A.2d 76 (App.Div.1997) (noting "venerable rule of law that permits an injured plaintiff to use violation of a legislatively established standard as evidence of negligence for the consideration of the jury, as long as the plaintiff was one of a class for whose benefit the statute was enacted") (internal quotations and citations omitted).
In this case, there is no doubt that the minor children were members of the class that N.J.S.A. 9:6-8.10 was meant to protect and that they suffered precisely the *934 type of harm from which the statute was intended to protect them. Further, there is no doubt that a wife can be a person who is subject to the obligation imposed by the statute. See Hill, supra, 232 N.J.Super. at 356, 556 A.2d 1325. If Mary herself had discovered the sexual abuse of the children, or even had "reasonable cause to believe" that they had been sexually abused, she would have been lawfully compelled to report that occurrence. See N.J.S.A. 9:6-8.10. Further, the child-abuse reporting statute provides a standard of care in that it requires anyone who has "reasonable cause to believe" that a child is being sexually abused to report the abuse to DYFS. This statutory standard, however, does not purport to incorporate or codify any common-law standard. Moreover, the statute does not expressly attempt to resolve for purposes of civil liability the comparative interests of the parties, and the Court must heed not only the public policy of protecting children, but also that of promoting stability in marriage. Accordingly, we do not conclude that the Legislature intended that the child-abuse reporting statute constitute an independent basis for civil liability or that its violation constitute negligence per se. Nevertheless, because the protections provided, the evils addressed, and the obligations imposed by the reporting statute parallel those that would be relevant in recognizing the existence of a duty as a basis for a civil remedy, we determine that a violation of the statute may constitute evidence of negligence in circumstances such as those presented in this case.
Considerations of fairness implicate the scope as well as the existence of a duty. In defining the duty to be imposed, the court must weigh the ability and opportunity of the defendant to exercise reasonable care. See, e.g., Kuzmicz, supra, 147 N.J. at 515, 688 A.2d 1018; Carvalho, supra, 143 N.J. at 573, 675 A.2d 209. Defendant contends that the imposition of a duty to prevent her husband from engaging in sexual abuse of another person would be unfair. She argues that sexual offenses are extremely difficult to combat and that she did not necessarily have the power, the ability, or the opportunity to control her husband and should not be expected or required to police his conduct continuously. However, fairness concerns in these circumstances can be accommodated by a flexible duty of care that requires a spouse, when there is particularized foreseeability of harm of sexual abuse to a child, to take reasonable steps to prevent or warn of the harm. See Franklin, supra, 930 S.W.2d at 928-29 (holding that "a duty exists to not place a child in a situation in which the risk of sexual abuse is heightened and in which the risk is foreseeable" and that therefore a wife who "knew or should have known of her husband's proclivities, [] should have taken steps to ensure that [the grandchild] would not be placed in harm's way or to otherwise ensure that her husband would not be in a position to act on his temptations"); Phillips v. Deihm, 213 Mich.App. 389, 541 N.W.2d 566 (1995) (finding that victim of sexual abuse had cause of action against pedophile's wife who was allegedly aware of, but failed to prevent, the abuse that occurred in the marital home and pickup truck); Pamela L., supra, 169 Cal.Rptr. 282 (finding that children who suffered sexual abuse stated valid cause of action against pedophile's wife, where the complaint alleged that the wife knew her husband had molested children in the past, she encouraged and invited the children to be alone with her husband in the family pool when she was at work, and she unreasonably exposed the children to harm); Chaney, supra, 46 Cal.Rptr.2d at 76 (noting that "public policy requires that where a child is sexually assaulted in the defendant wife's home by her husband, the wife's duty of reasonable care to the injured child depends on whether the husband's behavior was reasonably foreseeable"); see also T.A. v. Allen, supra, 669 A.2d at 364-65 (Olszewski, J., dissenting) (arguing that where step-grandmother knew or had reason to know of her husband's pedophilia, she had a duty to warn the children of the danger posed by their grandfather); id. at 372 (Ford Elliott, J., dissenting) (arguing that wife in those circumstances had duty to protect the children from a known child abuser, not simply to warn them of the danger); cf. Arvanitis v. Hios, 307 N.J.Super. 577, 705 A.2d 355 (App.Div.1998) (citing Appellate Division decision in this case and holding that layperson, a wife, owes *935 duty of reasonable care under the circumstances to her nephew who was injured while assisting her in convincing her husband, whom she knew to have violent tendencies, to take his medication); Tarasoff, supra, 131 Cal.Rptr. 14, 551 P.2d at 340 (imposing duty of reasonable care when defendant knew that a third person posed a risk of harm to the victim).

C.
Considerations of foreseeability, the comparative interests and relationships of the parties, and public policy and fairness support the recognition of a duty of care. Based in large measure on the strong public policy of protecting children from sexual abuse, we conclude that there is a sound, indeed, compelling basis for the imposition of a duty on a wife whose husband poses the threat of sexually victimizing young children.
Closely-related to the recognition of a duty, however, is the issue of proximate causation, which must also be considered in determining whether any liability may be allowed for the breach of such a duty. Proximate causation is "that combination of `logic, common sense, justice, policy and precedent' that fixes a point in the chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery." People Express, supra, 100 N.J. at 264, 495 A.2d 107 (quoting Powers v. Standard Oil Co., 98 N.J.L. 730, 734, 119 A. 273 (Sup.Ct.), aff'd o.b., 98 N.J.L. 893, 121 A. 926 (E. & A.1923)); accord Prosser, Torts § 41 at 236-37 (3rd ed. 1964) ("As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability.").
Ordinarily, issues of proximate cause are jury questions. See Martin v. Bengue, Inc., 25 N.J. 359, 374, 136 A.2d 626 (1957). However, our courts have, as a matter of law, rejected the imposition of liability for highly extraordinary consequences. See, e.g., Caputzal v. The Lindsay Co., 48 N.J. 69, 77-80, 222 A.2d 513 (1966) (holding that even if defect in water softener caused rusty discoloration of water, manufacturer was not liable to plaintiff who sustained idiosyncratic and highly extraordinary heart attack brought on by fright at sight of discolored water); Glaser v. Hackensack Water Co., 49 N.J.Super. 591, 597, 141 A.2d 117 (App.Div.1958) (holding that water company whose employee entered plaintiff's garage without notice to read meter was not liable to plaintiff who became frightened for safety of infant daughter and injured herself while running downstairs); see also Restatement, supra, § 435(2) ("The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.").
It does not seem highly extraordinary that a wife's failure to prevent or warn of her husband's sexual abuse or his propensity for sexual abuse would result in the occurrence or the continuation of such abuse. The harm from the wife's breach of duty is both direct and predictable. There is little question, here, that the physical and emotional injuries allegedly suffered by the girls are hardly an extraordinary result of John's acts of molestation and that their victimization is not an extraordinary consequence of Mary's own negligence. Mary's negligence could be found to be a proximate cause of plaintiffs' injuries. See Hill v. Yaskin, 75 N.J. 139, 147, 380 A.2d 1107 (1977).
Accordingly, we hold that when a spouse has actual knowledge or special reason to know of the likelihood of his or her spouse engaging in sexually abusive behavior against a particular person or persons, a spouse has a duty of care to take reasonable steps to prevent or warn of the harm. Further, we hold that a breach of such a duty constitutes a proximate cause of the resultant injury, the sexual abuse of the victim.

III
In determining how the standards for duty, negligence, and proximate cause should be applied in this case, we view the facts in the light most favorable to plaintiffs. See Brill, supra, 142 N.J. at 523, 666 A.2d 146.
It may be found that the relationship between the next-door neighbors' in this case *936 had been close. Mary knew that the neighbors' adolescent girls were visiting at her home nearly every day and that they spent considerable amounts of time there alone with her husband. Moreover, she never "confronted" her husband about the unsupervised time he was spending with the girls. At both the trial level and on appeal, Mary conceded for the purposes of argument that "at all relevant times" she "knew or should have known of her husband's proclivities/propensities." Thus, it may be determined that it was particularly foreseeable that John was abusing the young girls. Further, the evidence at trial could support a finding of negligence on Mary's part. It is inferable, as explained by the Appellate Division, that Mary could have discharged her duty by confronting her husband and warning him, by insisting or seeing that the girls were not invited to ride or care for the horses, by keeping a watchful eye when she knew the girls to be visiting with her husband, by asking the girls' parents to ensure that the children not visit when she was not present, or by warning the girls or their parents of the risk she perceived. See 301 N.J.Super. at 157, 693 A.2d 1191. Finally, the evidence may be found sufficient to support the determination that the harm suffered by the girls was not a highly extraordinary result of the breach of that duty.
We also conclude that summary judgment in this matter was premature. Summary judgment was entered only five months after Mary's answer was filed and only two months after her amended answer. Id. at 154 n. 2, 693 A.2d 1191. The Appellate Division ruled that plaintiffs should have been given the opportunity to depose John and others to try to discover further evidence bearing on Mary's knowledge of John's conduct or sexual proclivities. See id. at 157-58, 693 A.2d 1191. We concur. If the motion for summary judgment is renewed, the trial court may consider whether a reasonable jury could find that, under the totality of the circumstances based on the standards set forth herein, Mary knew or should have known of the abuse and could have taken reasonable actions to have prevented such abuse.

IV
We affirm the judgment of the Appellate Division.
For affirmanceChief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN7.
OpposedNone.
NOTES
[1] The Appellate Division opinion suggests that plaintiffs' amended complaint additionally alleged "that Mary was aware of her husband's history of pedophilia as well as his conduct involving these children." 301 N.J.Super. at 153, 693 A.2d 1191. No such allegation appears in the amended complaint.
[2] Following summary judgment for Mary, plaintiffs continued their suit against John, and a judgment was entered against John and in favor of the two minor plaintiffs, awarding each $100,000 in compensatory damages, $25,000 in punitive damages, and $12,439.72 in prejudgment interest. However, plaintiffs contend that their prospects of any recovery on their judgment against John are speculative at best given that John and Mary have declared bankruptcy and that John's intentional conduct was not covered by defendants' homeowners' policy.
[3] Other statutes deal extensively and comprehensively with the subject of protecting children from sexual abuse. See, e.g., N.J.S.A. 2C:14-4b(1) (making lewdness a crime of the fourth degree if the actor knows or reasonably expects that he is likely to be observed by a child under 13); N.J.S.A. 2C:24-4 (making it a crime for a person who has a legal duty to care for a child to engage in sexual conduct that would impair or debauch the morals of the child); N.J.S.A. 2C:34-1b(7) (making it a crime to engage in prostitution with a person under 18); N.J.S.A. 2C:43-6.4a (making it permissible for a person convicted of sexual assault of a child or endangering the welfare of a child to receive a special sentence of community supervision for life); N.J.S.A. 2C:52-2b (noting that records of conviction for endangering the welfare of a child by engaging in sexual conduct are not subject to expungement); N.J.S.A. 9:6A-3 (authorizing the Child Life Protection Commission to approve grant applications from organizations that encourage the development of community programs that offer sexual abuse prevention training for children); N.J.S.A. 18A:6-7.1 (mandating that any facility under the supervision of the Department of Education shall not hire an individual whose criminal history check reveals a record of conviction for child molestation or sexual offense); N.J.S.A. 18A:35-4.5 (authorizing local boards of education to establish a sexual assault prevention education program); N.J.S.A. 30:4-123.53a (mandating that the Department of Corrections provide written notification to county prosecutors of the anticipated release from incarceration of a person convicted of the sexual assault of a child); N.J.S.A. 30:4-123.54b(1)(b) (mandating that a report containing a psychological evaluation be prepared for every person who is convicted of sexual assault or endangering the welfare of a child and be filed with the parole board); N.J.S.A. 30:8-44.1a (mandating that inmates convicted of a crime involving sexual offense or child molestation be excluded from work release and vocational training release programs).