**Pat DOE (A Pseudonym), Appellant,**

v.

**Inez FRANKLIN, Appellee.**

No. 08–95–00358–CV.

Court of Appeals of Texas, El Paso.

Sept. 19, 1996.

Rehearing Overruled Oct. 16, 1996.

Jeffrey Jon Parras, Midland, R. Mike Borland, Borland & Borland, Midland, for Appellant.

William W. Clifton, Jr., Boldrick, Clifton, Nelson & Holland, Midland, for Appellee.

## *OPINION*

McCLURE, Justice.

Appellant, Pat Doe, sued her paternal grandparents, James and Inez Franklin, on negligence theories arising from the childhood sexual molestation Doe suffered at the

hands of her grandfather.[1] Doe alleged that Inez negligently failed to warn her of and to protect her from this victimization. Inez moved for summary judgment, asserting that she owed no duty to Doe and that her husband's acts were unforeseeable intervening causes. Summary judgment was granted in favor of Inez and all claims by Doe against James were severed. The specific grounds upon which judgment was granted were not reflected in the order.

## SUMMARY OF THE EVIDENCE

Pat Doe was born May 15, 1974. When she was approximately four years old, sometime during 1978 or 1979, James began to sexually molest her. Doe testified on deposition that her grandfather would kiss her with his tongue and touch her vagina. This activity occurred over a four or five year period until she was nine years old, although she could not remember exactly how many times or the exact frequency with which it occurred. James admitted that he molested Doe approximately once every other month, usually while he and Doe were sitting on a couch beneath a blanket. In a statement given to the Ector County Sheriff's Department, he confessed to touching another of his granddaughters in the vaginal area, to kissing Doe on her bare buttocks, and to reaching under his daughter's shirt and fondling her breast.

During her deposition, Doe related in specific detail one of the episodes with her grandfather that occurred during the summer between her second and third grade years of school. She was wearing tight fitting pants with ornate stitching on the pockets[2] which she had somewhat outgrown. James chased her around the coffee table and tried to unfasten her pants, but they were too tight. As he tried to unbutton the pants, he pinched her. Eventually, he loos-

ened them and fondled her. When her grandmother returned to the house, Doe tried to tell her what her grandfather had been doing. She testified that she told Inez that James had been sexually molesting her, though she could not remember the exact words that she used. She did remember standing in front of the pantry just outside of the bathroom and telling Inez about the incident while Inez was putting something away. She also remembered how Inez responded to the outcry:

> She reacted violently, told me not to tell anybody, she grabbed my arm and shook me, 'Never say anything like that again. Don't you ever say anything like that,' I remember her saying that. And then I remember she didn't tell anybody and that she glowered at me all the rest of the time I was there.

About a year later, Doe's mother read a passage from Doe's diary. In it, Doe had written "something to the effect that [her grandfather] was always trying to get something from me for nothing." Doe's parents confronted her that evening and learned for the first time that Doe was being molested by her grandfather. Doe testified that she had not told anyone other than her grandmother because she felt that she was in some way at fault and that she was the one in the wrong. Doe's father confronted James, who denied any wrongdoing. Inez claimed that this was the first time she ever heard these accusations and that she did not then believe them to be true. Only years later, when her husband confessed to sexually molesting his other granddaughter, did Inez believe the allegations. Once Doe's parents learned of the sexual abuse, Doe was never again alone with James.

## STANDARD OF REVIEW

▮ The standard of review on appeal of a summary judgment is whether the suc-

---

1. We note at the outset that this is not a situation in which the molestation is denied. Indeed, James Franklin confessed to, was charged with, and convicted of felony indecency with a child. He received a probated sentence of three years which he has completed.

2. The stitching on the pants was significant in that it enabled Doe to remember the time frame in which she had told her grandmother of the molestation. She testified that she had gotten pants with colored stitching, which was "the big thing" at the time.

cessful movant at the trial level carried the burden of showing that no genuine issue of material fact existed and that judgment should be granted as a matter of law. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991); *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985); *Cortez v. Liberty Mut. Fire Ins. Co.*, 885 S.W.2d 466, 469 (Tex.App.—El Paso 1994, writ denied). Thus, the question on appeal is not whether the summary judgment proof raises fact issues as to the required elements of the plaintiff's cause or claim, but whether the summary judgment proof establishes, as a matter of law, that no genuine issue of material fact as to one or more elements of plaintiff's cause or claim exists. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970). In resolving the issue of whether the movant has carried this burden, all evidence favorable to the non-movant must be taken as true and all reasonable inferences, including any doubts, must be resolved in the non-movant's favor. *Nixon*, 690 S.W.2d at 548–49; *DeLuna v. Guynes Printing Co. of Texas, Inc.*, 884 S.W.2d 206, 208 (Tex.App.—El Paso 1994, writ denied). When the defendant is the movant and when summary judgment evidence disproving at least one essential element of each of the plaintiff's causes of action is submitted, summary judgment should be granted. *Perez*, 819 S.W.2d at 471; *Bradley v. Quality Service Tank Lines*, 659 S.W.2d 33, 34 (Tex.1983); *Cortez*, 885 S.W.2d at 469. When the summary judgment does not state the grounds upon which it was granted, the judgment will be affirmed if any of the theories advanced in the summary judgment motion are meritorious. *State Farm Fire & Cas. Co. v. S.S. & G.W.*, 858 S.W.2d 374, 380 (Tex.1993); *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76, 79 (Tex.1989); *Hernandez v. Kasco Ventures, Inc.*, 832 S.W.2d 629, 632 (Tex.App.—El Paso 1992, no writ). However, a summary judgment will be affirmed only upon the grounds specifically stated in the motion. *McConnell v. Southside Independent School District*, 858 S.W.2d 337, 339 (Tex.1993).

This appeal involves two questions. We must first determine whether a material fact issue exists as to whether Inez had notice of her husband's criminal behavior. Next, we must determine whether, given such notice, Inez owed a duty to Doe. We also necessarily address the closely related issue of proximate cause.

## NOTICE

Doe's response to the motion for summary judgment was supported by her affidavit, her deposition, and the depositions of Inez and James. Inez objected to Doe's affidavit, arguing that it was not competent summary judgment proof because it was composed of opinions and conclusions. After summary judgment was granted, Inez moved that the order be amended to sustain her objections, and the trial court obliged. In her first two points of error, Doe complains that the trial court erred in sustaining the objections. In her third point of error, she alleges that notwithstanding the sufficiency of the affidavit, her deposition testimony was sufficient to raise a fact issue as to whether Inez had notice of the sexual molestation. In her brief, Inez suggests that Doe's "affidavit differs considerably from her sworn deposition testimony." Our inquiry thus begins with a comparison of Doe's deposition testimony and her affidavit.

The affidavit contains the following statements concerning the notice issue:

When I was eight (8) years old during the summer between my second and third grade school years, I told my grandmother that my grandfather was sexually molesting me. I do not remember the exact words I used, because it was many years ago and I was only eight (8) years old at the time that I told my grandmother. However, I clearly remember the event of telling my grandmother about what my grandfather had done. My grandmother and I were standing in front of the pantry that is located in front of the bathroom in my grandparents' old residence on Bagley Street in Odessa.

When I told her what my grandfather had done, she reacted violently by grab-

bing my arm and shaking me and saying 'Never say anything like that again. Don't you ever say anything like that!'

By contrast, Doe's testimony on deposition stated the following:

Q: Okay. When did you tell your grandmother?

A: Between—it was in August, it was in—between my second and third grade year.

Q: Between your second and third grade year, you remember it was between your second and third grade year?

A: Yes, sir.

Q: And what—how do you place it between those two years, second and third grades?

A: Because I got pants that had stitching on them, and I thought I was hot stuff, you know. And they were getting too tight and he had chased me around the coffee table that day and trying to get my pants undone that he pinched me.

 * * * * * *

Q: You mean he pinched you intentionally trying to hurt you, or he pinched you by trying to unbutton your pants?

A: Trying to unbutton my pants.

Q: Okay. All right. And you remember—you placed that in the summer between your second and third grade because you remember having those pants that summer?

A: Because I got pants with stitching in second grade, with the colored stitching, and at the time, that was the big thing.

Q: Okay. And so what—so you got pinched, and then how did your grandmother become involved?

A: Well, she came home from wherever she was and she was putting something in the pantry that's right in front of the bathroom, and I told her and she just—

Q: What did you tell her when she was putting things in the pantry?

A: I don't know exactly what I told her. I told her something about what he was trying to do to me, I don't remember the exact words I used.

Q: When—did you tell her that he had pinched you or did you tell her that he was trying to get his hands inside your pants, or do you not remember?

A: I do not remember what I told her.

Q: So it could have been any of those things?

A: No, sir.

Q: Okay. Well, if you don't remember what you told her, why do you think you told her about some kind of problem with your grandfather?

A: Because otherwise she wouldn't have reacted as violently as she did. I do know that I told her about what he was doing to me.

Q: That day?

A: Yes, that day, in front of that closet, I told her.

Q: What did you tell her?

A: I do not remember the exact words that I told her.

Q: Why don't you just tell me as best you can recall what you told her about it?

A: I don't know.

Q: Okay. So you can't remember what you told her?

A: No.

Q: But what did she do?

A: She reacted violently, told me not to tell anybody, she grabbed my arm and shook me, 'Never say anything like that again. Don't you ever say anything like that,' I remember her saying that. And then I remember she didn't tell anybody and that she glowered at me all the rest of the time I was there.

 * * * * * *

Q: Okay. How long after that episode was it that your grandmother came home?

A: I don't know the time span between that.

Q: Okay. And—but you told her something, you don't remember what you told her, but you think it had something to do with your grandfather's sexual contact with you because she reacted violently; is that right?

A: I know what I told her was about him.

Q: Okay. How do you know that?

A: I do. I don't remember exactly what I told her, though.

Q: Well, okay. If you don't remember exactly what you told her, tell me what best you can recall that you discussed with her.

A: I just remember saying something about Pa and what he was doing to me.

Q: What did you tell her he was doing?

A: I don't remember, sir.

Q: You don't know what you told her?

A: No, sir.

Q: Okay. Do you think that you told her he had put his hands down your pants?

A: I don't know what I told her, sir.

Q: You don't know if you told her that?

A: I don't know what I told her.

Q: Did you tell her that he had touched your private parts?

A: I do not know what I told her.

Q: Did you tell her that this had happened on more than one occasion?

A: I don't know.

Q: Okay. And it's because there was this time when you were between second and third grade you would have been, what, eight years old?

A: I think so.

Q: Okay. When you were about eight years old, and you don't remember if you told her that he touched your private parts or stuck his hand down your pants or it happened before, but because she did not take whatever you told her and prevent this from happening, that is why she plays an important part in your problems; is that right?

A: That, and she knew it all along.

Q: She knew it all along? Is that what you're telling me?

A: That's what I believe, sir.

Q: Okay. Now, how did you come by this belief that she knew it all along?

A: Because it happened to her daughters, and it happened to the other cousin, and I do not believe that you can live with a person all those years and not know it.

Inez cautions us that this case presents the veritable danger of "hard facts" make "bad law". She further alleges that Doe's summary judgment evidence is conclusory and raises no more than a surmise or suspicion that Inez was informed of her husband's conduct prior to Doe's parents' intervention. Specifically, Inez argues that Doe's claim that she told Inez about her grandfather's conduct was insufficient to raise a fact issue because she could not relate the specifics of the conversation. Inez suggests that from the summary judgment evidence, one might infer that Doe told her that James was being mean to her, or that he was a bad man, or that he had hurt her. She argues that none of these statements were sufficient to provide her with notice that Doe was the victim of sexual molestation. She warns that Doe's inability to remember the precise words or language she used in her outcry underscores the current debate as to repressed memory syndrome and the likelihood of false charges.

■ However, these assertions violate the most basic summary judgment rule—that all reasonable inferences be taken in favor of the non-movant. It appears to us that the description of the outcry is consistent in both the deposition testimony and in the affidavit. Doe's ability to remember the date of the event within a reasonable window of time, the circumstances of what she was wearing,

the reason she was able to remember the event, the precise location at which the confrontation occurred, and her grandmother's violent reaction is readily demonstrated. She is equally consistent with her candor that she cannot remember the precise words she used in her then eight-year-old vocabulary to explain what her grandfather was doing to her. To that extent, the only significant difference between her statements is that her affidavit contains the allegation that she told her grandmother that "[her] grandfather was sexually molesting [her]" which is missing from the deposition testimony. We are not persuaded that this descriptive label is essential to the presentation of a fact issue concerning whether Inez had notice of her husband's sexual escapades. Instead, we conclude it is indeed reasonable to infer that when Doe told her grandmother that she was being molested, she related acts of sexual conduct being inflicted upon her by her grandfather. The violent reaction which Inez had to this disclosure lends credibility to this inference. It is also reasonable to infer that Inez would have more of a reaction to a statement of "sexual molestation" than to the benign statements she suggests. Besides, she offered no explanation for this event, or the nature of this conversation as she perceived it, other than to deny that she knew of her husband's activities. Because the deposition in and of itself raises a fact issue as to what Inez knew about the sexual activity between James and Doe, Point of Error No. Three is sustained. Because of our resolution, we need not address Points of Error Nos. One and Two challenging the trial court's action in sustaining the objections to Doe's affidavit.

## THE DUTY

In Point of Error No. Five, Doe alleges that the trial court erred in granting summary judgment because Inez did not conclusively negate any essential element of Doe's cause of action. The motion for summary judgment alleged that Inez owed no duty and that Doe could not establish causa-tion. We first address whether Inez owed a duty to Doe. Duty is the threshold inquiry in a negligence action, and is a question of law for the court to decide based upon the facts surrounding the occurrence in question. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). Generally, a person does not have a duty to prevent another's criminal acts. *See id.* at 525 (*citing* RESTATEMENT (SECOND) OF TORTS § 315 (1965)). However, an exception exists if there is a special relationship between the tortfeasor and the criminal actor, such as employer and employee, parent and child, or independent contractor and contractee. *Greater Houston Transp. Co.*, 801 S.W.2d at 525. Inez argues that no such relationship exists in this case. We agree; in fact Doe disavows that her action is based on any ability that Inez might possess to control her husband's actions.

Applying the "foreseeable plaintiff" rule of *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99, 100 (1928), the Supreme Court has recognized what might be called another limited exception to the general rule. *See El Chico Corp. v. Poole*, 732 S.W.2d 306 (Tex.1987); *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex.1983). In essence, a person has a duty to not place another in harm's way of foreseeable criminal activity. "In determining whether the defendant was under a duty, the court will consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Greater Houston Transp. Co.*, 801 S.W.2d at 525; *see also Otis Eng'g Corp.*, 668 S.W.2d at 309. Of these balancing factors, foreseeability is the foremost and dominant consideration. *El Chico Corp.*, 732 S.W.2d at 311. These exceptions appear to involve only misfeasance, as opposed to nonfeasance. *Otis Eng'g*, 668 S.W.2d at 309–10. In other words, an affirmative act is required.[3]

We first look for any affirmative action on the part of Inez and then apply the balancing

---

**3.** In a recent opinion involving a similar issue,

the Supreme Court found a duty to exist based

factors to determine whether she was subject to a duty. In her first amended petition, Doe alleged:

> *Inez Franklin, on multiple occasions, negligently allowed plaintiff to visit in her home and stay overnight* without exercising ordinary care for plaintiff's care and protection or taking any precautions to protect the minor plaintiff from James L. Franklin.

> *Inez Franklin, on multiple occasions, negligently allowed plaintiff to visit in her home and left plaintiff alone with James L. Franklin,* without exercising ordinary care for plaintiff's care and protection or taking any precautions to protect the minor from James L. Franklin.

> Specifically, plaintiff alleges that on multiple occasions defendant, Inez Franklin, negligently failed to notify plaintiff's parents or minor plaintiff of the danger posed by defendant James L. Franklin, *negligently left plaintiff alone with James L. Franklin* and negligently failed to take action in any way to protect plaintiff from James L. Franklin. As a result of defendant Inez Franklin's negligence, plaintiff was repeatedly sexually molested and abused by defendant James L. Franklin. [Emphasis added].

In effect, Doe complains of the act of leaving a young child under the care and supervision of a person who is known or should be known to be a pedophile. In addition, Doe asserts that Inez was negligent in allowing Doe to come into her home when it was occupied by a known or suspected pedophile. This second assertion is concerned with the duty that

inures when a person undertakes the care and supervision of a child,[4] rather than a duty that may arise as a result of a person's status as an owner or occupier of land.

We next turn to the question of foreseeability. It is foreseeable that a child will be victimized if left alone or brought into close proximity with a pedophile. A reasonable parent will protect a child, or grandchild, from predatory behavior and is likely to be highly reluctant to, if not absolutely prohibitive of, allowing a child near a pedophile. If Inez knew or should have known of her husband's proclivities, she should have taken steps to ensure that Doe would not be placed in harm's way or to otherwise ensure that her husband would not be in a position to act on his temptations.

 Weighing *against these factors is the* social utility of care giving. In areas plagued by low wages, or in communities suffering corporate downsizing, parents are forced to work two and sometimes three jobs to provide for their families. As a result, thousands of children experience public day care or familial caretaking on a daily basis. In modern society, the number of women entering the work force has increased dramatically, whether the choice be one of economics or personal satisfaction. Indeed, as we approach the dawning of a new century, care giving is more a social necessity than a social utility. The risk that a child will be sexually abused is thankfully not endemic to care giving. Placing a child in a situation in which another can take advantage of her helplessness has no social utility. We conclude that the burden upon Inez was slight.

on an affirmative act of referral. *Golden Spread Council, Inc. # 562 of the Boy Scouts of America v. Akins,* 926 S.W.2d 287, 291–92 (1996). There, the Golden Spread Council ("GSC") recommended to a church sponsoring a new boy scout troop a candidate for scoutmaster. GSC had previously received information that this candidate had been "messing with some boys." *Id.* at 289. The Court applied the balancing text and determined that a duty existed with respect to GSC. *Id.* at 1008. "GSC's *affirmative act* of recommending [the candidate] as a potential scoutmaster to the church created a duty on the part of GSC to use reasonable care in light of the information it had received." *Id.* [emphasis add-

ed]. However, the Court found that GSC had no duty to investigate the candidate or to divulge to the church, or to anyone else, the information it had received. *Id.*

4. It may be reasonably inferred that when a young child is *left alone* with an adult, that adult is assuming the position of care giver. It is also reasonable to infer that Doe did not mysteriously appear in Inez's presence without some understanding that she would provide Doe with care and supervision.

She need not have assumed the task of caring for her granddaughter; once she did so, she should not have left Doe alone with her grandfather. Applying these balancing factors to the facts before us, we find that a duty exists to not place a child in a situation in which the risk of sexual abuse is heightened and in which the risk is foreseeable. *Cf. Cain v. Cain,* 870 S.W.2d 676, 680–81 (Tex.App.—Houston [1st Dist.] 1994, writ denied).

### CAUSATION

■ We now address the question of causation. Inez asserted in her motion for summary judgment that her husband's criminal acts were superseding causes. "Although the criminal conduct of a third party may be a superseding cause which relieves the negligent actor from liability, the actor's negligence is not superseded and will not be excused when the criminal conduct is a foreseeable result of such negligence." *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex. 1992); *see also Nixon,* 690 S.W.2d at 549. Inez asserts that even if she had notice that Doe was being sexually molested, she could not foresee that her husband would repeat that activity in the future.[5] We disagree; indeed a material fact question exists as to whether the harm that befell Doe was the foreseeable result of Inez's negligence. Point of Error No. Five is sustained. Because of our resolution, we need not address Point of Error No. Four dealing with newly discovered evidence.

The judgment is reversed and remanded for trial.

---

5. We pause here to comment that the current debate surrounding "Megan's Law" belies this very allegation. "Megan's Law"—federal legislation named for a seven-year-old New Jersey girl raped and murdered two years ago by a twice-convicted child molester living on her block— would require notification of local officials whenever dangerous child molesters or rapists are released from prison and move into their communities. The controversy centers on the public's right to protection from likely repeat offenders vs. an individual's right to privacy.