2009 OK CIV APP 92

**J.S., Individually, and as Parent and Next Friend of C.S., a Minor Child, Plaintiff/Appellee,**

v.

**Bradley Joe HARRIS, Defendant,**

and

**Vivian Williams, Defendant/Appellant.**

No. 105,004.

Court of Civil Appeals of Oklahoma, Division No. 2.

July 9, 2009.

Certiorari Denied Oct. 12, 2009.

Pamela L. Anthony, Hood & Raynolds, P.C., Tulsa, Oklahoma, for Plaintiff/Appellee.

Stephen M. Coates, Wilson, Cain & Acquaviva, Tulsa, Oklahoma, for Defendant/Appellant.

DEBORAH B. BARNES, Presiding Judge.

¶1 Appellant/Defendant, Vivian Williams (Williams), appeals from a final judgment on a jury verdict in an action by Appellee/Plaintiff, J.S., on behalf of her son, C.S.,[1] alleging negligence and from the trial court's Order denying Williams' Motion for Judgment Notwithstanding the Verdict,[2] and from the trial court's Order granting prejudgment interest and post-judgment interest. On appeal, Williams raises four issues, but the dispositive issue on appeal is whether the trial court erred in denying Williams' Motion for Judgment Notwithstanding the Verdict. Because the trial court erroneously found that Williams owed a duty of care to C.S., we reverse and remand with directions.

## FACTS AND PROCEDURAL BACKGROUND

¶2 On December 27, 2001, C.S., then 15 years old, was sexually molested by Williams' grandson, Defendant Bradley Joe Harris (Harris),[3] inside a mobile home owned and occupied by Williams. Williams denied she owed any duty to C.S. and denied she was negligent. She twice timely filed motions for

---

1. J.S. is the mother of C.S. Bradley Joe Harris was also a defendant whom Plaintiff sued for sexual assault and battery and intentional infliction of emotional distress and other claims. Williams claimed both C.S. and J.S. were contributorily negligent because of their failure to exercise ordinary care with respect to the relationship between Harris and C.S. The jury returned a general verdict in favor of Plaintiff and against both Defendants for damages in the amount of $75,000 and returned a verdict in favor of Williams on her counterclaim against J.S. for contributory negligence. The jury put Williams' percentage of fault for the injuries to C.S. at 17.5 percent. Neither J.S. nor Harris appeal from the judgments against them.

2. Williams had timely filed Motions for Directed Verdict at the close of Plaintiff's case in chief and after Defendants rested; both motions were denied.

3. Harris was convicted in 2002 for lewd molestation and forcible sodomy for the sexual assault against C.S.

directed verdict, which were denied. Williams also timely filed her Motion for Judgment Notwithstanding the Verdict and argued that her motions for directed verdict should have been granted because no evidence was produced that established Williams should have known that Harris would sexually molest C.S. on December 27, 2001. Plaintiff conceded that Williams had no actual knowledge that Harris would sexually molest C.S. Williams also argued that her motions for directed verdict should have been granted because she owed no duty to C.S. and, if she did owe a duty, she was not liable because Harris' intentional and criminal conduct was an intervening and superceding cause of the injury to C.S.

¶3 In March of 2001, Williams invited Harris to live in her trailer home until he could get settled after his honorable discharge from the military. He testified he paid no rent. Harris, then 23 years old, was employed full time, had no criminal record, and had no reported disciplinary or other problems in elementary, middle or high school. He had not told Williams he was sexually attracted to minors. Harris testified he was free to come and go from Williams' home as he chose, was free to invite whomever he chose to her home, and was expected to act as an adult and a gentleman while he was staying in her home. Harris testified that he had no doubt his grandmother would throw him out of her house if he did not behave properly and lawfully.

¶4 In the nine months Harris lived in Williams' home, Williams was gone for about two and a half months to care for her infirm elderly father in Ohio. However, during the period she was at her home, she testified that she never saw Harris with any person in her home other than C.S.[4] C.S. testified, however, that other minors came to Williams' home with Harris. On the three occasions she saw C.S. in her home, Williams testified that she had virtually no conversation with him other

than to say "Hi." What she testified she saw was C.S. leaving Harris' bedroom one morning and going out the front door with Harris. C.S. also testified that Williams saw him leave Harris' bedroom about 8:00 a.m. and walk out the front door with Harris while Williams prepared breakfast. Thereafter, she saw C.S. arrive at her home one evening with Harris to watch television in her living room, which they continued to do after she went to bed, as usual, sometime between 9:00 and 10:00 p.m. On the night C.S. was sexually molested, the third time she saw C.S., he and Harris went into Williams' bedroom where she had retired for the night. C.S. testified that Harris told his grandmother that C.S. was going to spend the night. C.S. said "Hi." Williams said "Hi." Harris and C.S. both testified that they then went to Harris' bedroom.

¶5 Although Williams did not know if C.S. had permission from his parents to be at her home, J.S. testified that she gave her son permission to spend the night with Harris at his grandmother's home on the 15 or so occasions C.S. spent the night with Harris, including the night C.S. was sexually molested. Although Williams did not know where Harris was spending his free time, Harris testified that he spent his free time in the company of other minors, including C.S., at a roller rink that had been operated by J.S. until August 2001, but to which C.S. continued to go through December 2001. Although Harris' interactions with these minors and their parents were unknown to Williams, Tim Norris, a former Claremore Police Officer, who investigated the sexual molestation charge against Harris, testified that Harris gained the trust of the parents and minors with whom he engaged at the rink. Harris testified that Williams knew he had a good and longstanding relationship with J.S. and her husband, S.S., but Williams never met or spoke to them. J.S. testified that she never met or spoke to Williams, though she consid-

---

4. During her deposition testimony, Williams said the only person she ever saw at her home with Harris was C.S. She was asked to look at a photograph and asked if she knew the boy in the picture. She was unable to identify the boy, though the picture was a picture of C.S. At trial, Williams again testified that the only person she ever saw at her house was C.S. The attorney for C.S. used the deposition testimony and her inability to identify C.S. in the photograph to allow the jury to infer that Williams knew of at least one other minor who was in Harris' company while in her home.

ered Harris to be a "big brother figure" to her son who, at 15, had not yet reached puberty and, according to his mother, still had a round, baby-face.

¶ 6 While Williams imposed no particular rules on Harris while he lived in her home, she had access to his bedroom. The door had no lock, and she freely entered the bedroom to clean it. Harris testified that he kept swords and a loaded pistol in his room, usually in his closet, but not otherwise secured or hidden. Harris was trained in law enforcement while in the military and participated in various special operation missions. The swords were souvenirs from those missions, and the gun was one he had been trained to use. Williams testified that she had no knowledge of the gun, though she went into his closet to clean. She did see swords he openly kept in his room.

¶ 7 On the night C.S. was sexually molested, Williams heard no noises coming from Harris' bedroom, which was at the other end of the trailer and separated from her bedroom by the living room and kitchen. C.S. also testified that he never told Williams about the sexual assault, nor did he seek her help or anyone else's after the assault that night. It was not until a week after the assault that C.S. told his sister, then his parents, about what Harris had done. He did so after learning from one of his other friends that Harris had sexually molested him, too, in Williams' home.

## STANDARD OF REVIEW

¶ 8 Review of a ruling on a motion for judgment notwithstanding the verdict is *de novo*, since it presents a question of law. *First National Bank in Durant v. Honey Creek Entertainment Corp.*, 2002 OK 11, 54 P.3d 100; *Cline v. DaimlerChrysler Co.*, 2005 OK CIV APP 31, 114 P.3d 468. In any action based on negligence, the first prerequisite must be to establish the existence of a legally cognizable duty. *Wofford v. Eastern State Hospital*, 1990 OK 77, 795 P.2d 516, 518. Duty is a question of law for the court in a negligence action. *Delbrel v. Doenges Brothers Ford, Inc.*, 1996 OK 36, 913 P.2d 1318.

## ANALYSIS

¶ 9 No actionable negligence claim can lie where the defendant has breached no duty owed to the plaintiff. Absent a special relationship, a defendant has no duty of care to the plaintiff for the intentional and criminal acts of a third person against that plaintiff. *Joyce v. M & M Gas Co.*, 1983 OK 110, ¶ 5, 672 P.2d 1172, 1173. "Just because the defendant has created a risk which harmed the plaintiff that does not mean that, in the absence of some duty to the plaintiff, the defendant will be held liable." *Nicholson v. Tacker*, 1973 OK 75, ¶ 11, 512 P.2d 156, 158.

¶ 10 Oklahoma follows the common law principle of negligence that generally no duty is owed to aid or protect another. Nor does a person have a duty to anticipate and prevent the intentional or criminal acts of a third party, absent special circumstances. The types of special circumstances recognized in Oklahoma are: (1) where the actor is under a special responsibility toward the person harmed; and (2) "where the actor's own *affirmative* act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable [person] would have taken into account." *Joyce v. M & M Gas Co.*, at ¶ 5, 672 P.2d at 1174. (Emphasis added.) The court in *Henry v. Merck and Company, Inc.*, 877 F.2d 1489 (10th Cir.1989)(quoting *Nicholson*) noted that other jurisdictions recognize additional special circumstances that create a duty to anticipate and prevent the acts of third parties. 877 F.2d at 1492, n. 5 (citing *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), the seminal decision in which the California court ruled that once a psychotherapist determines, or pursuant to his or her professional standards reasonably should have determined, that a patient presents a serious danger of violence to others, the psychotherapist bears a duty to exercise reasonable care to protect the foreseeable victim from that danger).

¶ 11 Oklahoma courts have discussed special circumstances and special relationships as the bases for imposing liability on a defendant for the foreseeable harm a third person

may inflict on another. In *Felty v. City of Lawton*, 1977 OK 109, 578 P.2d 757, the Court discussed several California cases wherein the defendant driver left a vehicle unattended with the keys in the ignition, and subsequently a thief stole the vehicle and caused harmed to another because of the negligent or reckless operation of the vehicle. From its reading of those cases, the *Felty* Court concluded that "the 'special circumstances' rule recognized by the [California] courts ... is based upon the rationale that there are some 'special circumstances', under which not only the theft of an automobile with the keys in the ignition [is] foreseeable, but the negligent operation of the vehicle, if stolen, is also foreseeable, thus giving rise to a duty to prevent the foreseeable negligence."[5] *Id.* at ¶ 18, 578 P.2d at 762. (Footnote omitted.) The Court in *Felty* held, however, that under the facts pled in the appellants' petition, no special circumstances existed that would impose an additional duty on the part of the defendant to prevent the actions of third persons.

¶ 12 Special relationship as a basis for the liability of the defendant for the acts of a third person was also discussed in *Wofford v. Eastern State Hospital*, 1990 OK 77, 795 P.2d 516. The *Wofford* Court determined whether a hospital or a therapist had a duty to exercise reasonable care in the discharge of a mental patient for the benefit of persons injured by the released patient. The Court noted that the Restatement (Second) of Torts § 315 (1965) and a number of other courts recognize an exception to the common law rule that a person has no duty to prevent a third person from causing physical injury to another. *Wofford*, at ¶ 9, 795 P.2d at 518. Section 315 provides that a duty arises if "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection."

¶ 13 The *Wofford* Court recognized that the relationship between a psychotherapist and patient has been found to be a special relationship under the Restatement approach to duty, citing *Tarasoff*. The Court reasoned that in Oklahoma "courts have recognized that the existence of a duty depends on the relationship between the parties and the general risks involved in the common undertaking." *Wofford* at ¶ 10, 795 P.2d at 519. That duty "is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Id.* (Citations omitted.) The most important of those considerations in establishing the duty is the foreseeability of harm to the injured person. The Court held that:

> [A] psychiatrist has a duty to exercise reasonable professional care in the discharge of a mental patient.... This duty arises only when in accordance with the standards of his profession the therapist knows or should know that his patient's dangerous propensities present an unreasonable risk of harm to others. The duty extends to such persons as are foreseeably endangered by the patient's release.

*Id.* at ¶ 17, 795 P.2d at 520.

¶ 14 This Court, in a subsequent decision, said *Wofford* holds it is a question for the court whether a person stands in a special relationship to another such that the law will impose on that person an obligation of reasonable conduct for the benefit of the other. *Cooper v. Millwood Independent School District No. 37*, 1994 OK CIV APP 114, 887 P.2d 1370. In *Cooper*, this Court found that the relationship between a school bus driver and the student passengers is a special relation-

---

5. The Oklahoma Supreme Court set out in *Felty* in a footnote various examples of situations in which the negligent operation of a vehicle by a thief was held to be, or was characterized as, foreseeable. *See Richards v. Stanley*, 43 Cal.2d 60, 271 P.2d 23 (1954), in which the court suggested that leaving an automobile with the keys in the ignition in front of a school where it might reasonably be expected to be easy prey to irresponsible children, would make the negligent operation of the vehicle foreseeable; and *Richardson v. Ham*, 44 Cal.2d 772, 285 P.2d 269 (1955), in which the defendant left a 26-ton bulldozer, unattended and unlocked, which was then stolen for a joy ride by three inebriates who were able to get the dozer underway, but who were unable to control it. *Felty*, at ¶ 18, n. 1, 578 P.2d at 762, n. 1. The Oklahoma Supreme Court also referenced *Tarasoff* as a special relationship case.

ship under Oklahoma law, stating that the "students are effectively constrained while on the bus. Under these circumstances there is no way a student being attacked could escape the attack. Depending on the circumstances, where rowdy conditions are present on a school bus it could be foreseeable that one student might injure another." *Id.* at ¶ 13, 887 P.2d at 1374. This Court also referenced *Tarasoff,* saying that in that case, the "California Supreme Court held that when the avoidance of foreseeable harm requires a defendant to control the conduct of another person, the common law has traditionally imposed liability only if the defendant bears some *special relationship* to the dangerous person or to the potential victim." *Id.* at ¶ 19, n. 5, 887 P.2d at 1375, n. 5. (Emphasis in original.)

¶ 15 In 1997, the Oklahoma Supreme Court reiterated that while an individual would normally owe no duty of care to a third person for the acts of another, "every person is under a duty to exercise due care in using that which he/she controls so as not to injure another." *Lockhart v. Loosen,* 1997 OK 103, ¶ 13, 943 P.2d 1074, 1080. (Footnote omitted.) "In order for a duty to arise," however, "those persons bearing the duty's onus must have knowledge that their acts or omissions involve danger to another." *Id.* at n. 26. (Citation omitted.) In reversing the trial court's dismissal of the plaintiff's petition, the Court said that such a duty could be found where a husband's paramour, the defendant, had a venereal disease, infected the husband, who in turn infected his plaintiff wife, if the defendant knew or reasonably should have known she had the disease, if she copulated with the husband when she knew she was infectious, if she failed to warn the husband, and if she knew the husband was copulating with another and knew her identity. The Court said the reasonable foreseeable consequence of the defendant's silence, of that breach of duty to the husband, could be the transmittal of the disease to the husband's wife. If, on the other hand, the defendant "did *not* know or have reason to know of her

contagion, her silence would not rise to the level of actionable negligence as a matter of law." *Lockhart,* at ¶ 14, 942 P.2d at 1081. (Emphasis in original.)

¶ 16 A reading of these decisions reveals that Oklahoma recognizes the imposition of a duty on a person for the acts of a third person who injures another under circumstances where that person has a special responsibility toward the injured party, or where the person's own affirmative act created an unreasonably high risk that harm would occur to the injured party. They also reveal that Oklahoma recognizes that such a person may have a duty to the injured party where a special relationship exists between that person and the third person either because that person has special knowledge about the third person and control over that third person; or that person has control over some matter relative to that third person; or because of special circumstances that reasonably give notice to that person relative to a third person. Moreover, it is for the court to decide as a matter of law whether such a "special relationship" exists between the defendant and the injured party, or the defendant and a third person who inflicts harm on the injured party. In all of these cases,[6] foreseeability of the harm to the injured party is critical.

¶ 17 Plaintiff does not argue that Williams owed a duty to C.S. because of some special relationship as between the two of them. In fact, an exchange of salutations on the two or three occasions they saw each other was specifically referred to by C.S. as the only contact the two ever had. No argument was made and no evidence was produced that showed Williams was asked to accept, or did accept, any supervisory or other control over C.S. No argument or evidence was produced to show that Plaintiff entrusted her son to Williams' care. In fact, Plaintiff said she never met or spoke to Williams or knew if she would be present when her son stayed with Harris at his grandmother's home. Nor does Plaintiff argue that Williams engaged in

---

6. *Joyce v. M & M Gas Co.,* 1983 OK 110, 672 P.2d 1172; *Wofford v. Eastern State Hospital,* 1990 OK 77, 795 P.2d 516; *Lockhart v. Loosen,* 1997 OK 103, 943 P.2d 1074; *Felty v. City of* *Lawton,* 1977 OK 109, 578 P.2d 757; *Cooper v. Millwood Independent School District No. 37,* 1994 OK CIV APP 114, 887 P.2d 1370.

any "affirmative act" that created or exposed C.S. to a recognizable high degree of risk of harm through such misconduct, which a reasonable person would have taken into account.

¶ 18 Relying on *Wofford*, Plaintiff argues that Williams had a duty of due care toward C.S. for the harm caused by her·adult grandson, Harris, to C.S. in her home because she knew or should have known that harm was reasonably foreseeable, absent intervention by Williams. *Wofford*, however, requires something more. The duty imposed in *Wofford* is one owed to a foreseeable victim by the actor because he or she knew or should have known of the dangerous propensities of the third person who actually inflicted the harm on the foreseeable victim. It is the relationship between the actor and the third person and the special knowledge the actor has about the third person that gives rise to the duty to the foreseeable victim. In discussing the Restatement approach, the *Wofford* Court implicitly based its reason for the imposition of this duty, in part, on the control the therapist has over the patient and the opportunity to exercise that control. *Wofford*, at ¶ 9, 795 P.2d at 518. In *Wofford*, the control the defendants had was in the release or non-release from the hospital of the patient who had known dangerous propensities.

¶ 19 Oklahoma courts have not dealt specifically with a special relationship between a homeowner and another adult that might create a duty to control that adult's conduct in the context of a sexual assault upon a minor in the home. Other courts have. Relying on Restatement (Second) of Torts § 315 (1965), the Kansas Supreme Court found a wife had no duty to warn a minor about the unknown and unexpected criminal act by her husband, who invited the minor into their home and sexually assaulted him. *D.W. v. Bliss*, 279 Kan. 726, 112 P.3d 232 (2005). The Kansas Supreme Court discussed a number of cases involving sexual assault by a third person where a special relationship between or among the parties was the basis for imposing a duty.[7] The Kansas court concluded that an actor (the wife) had no duty to control the conduct of a third person (the husband) to prevent that third person from causing harm to others (the minor) absent some special relationship between the actor and the third party or the actor and the injured party. *Id.* at 243. The court said that where it "has considered the duty to control, we have required a finding that the person charged with the duty actually have the ability to control the third person's conduct." *Id.* (Citations omitted.) The husband, as a cotenant of the marital home, "had an undivided right to possession and control of the property. [The wife] had no right to restrict [her husband] as co-owner, from inviting [the minor] on to the property." *Id.* The court said, "[e]xtension of her ownership interest into responsibility for [the husband's] criminal actions is unwarranted." *Id.* at 243.

¶ 20 In *Doe v. Goff*, 306 Ill.App.3d 1131, 240 Ill.Dec. 190, 716 N.E.2d 323 (1999), the appellate court found that the defendant Boy Scouts owed no duty to protect a scout from sexual assault by an adult volunteer under a "special relationship" duty where the Boy Scouts could not reasonably foresee the adult's propensity to commit sexual abuse. The adult was a pediatrician, had no criminal record, and had no known propensity to be a child molester. The court said that foresee-

---

7. For example, the parents of a four-year-old child, who was sexually abused by a ten-year-old neighbor, while playing at the home in which the neighbor lived with his mother and her boyfriend, sued the boyfriend, asserting claims for negligent failure to warn and negligent failure to control. *Gritzner v. Michael R.*, 235 Wis.2d 781, 611 N.W.2d 906 (2000). The *Gritzner* court found the boyfriend had a duty to warn the parents, when he invited the four-year-old to the home, about the risk of harm the ten-year-old posed where the boyfriend knew the child had molested young children in the past and knew the child had a propensity to molest young females. *Id.* at 919–20.

The duty arose out of the special relationship/duty of a parent (or one in *loco parentis*) to control his or her child under the Restatement (Second) of Torts § 316. A duty has been found where the wife invited minors onto the property, in effect, procuring them for her husband, *Pamela L. v. Farmer*, 112 Cal.App.3d 206, 169 Cal. Rptr. 282 (1980); or where a grandmother failed to protect her grandchild from the known risk of sexual assault by the grandfather, *Doe v. Franklin*, 930 S.W.2d 921 (Tex.App.1996); or where the wife had actual knowledge of her husband's sexually abusive behavior, *J.S. v. R.T.H.*, 155 N.J. 330, 714 A.2d 924 (1998).

ability "must be judged by what was apparent to the defendant at the time of the attack ... not by what may appear through hindsight." *Id.* at 326. It must be "something that is objectively reasonable to expect, not merely what might conceivably occur." *Id.*

¶ 21 The question, then, is whether Williams was in a special relationship with Harris such that a duty was imposed upon her to control his actions. We find no such relationship existed between Harris and Williams.

¶ 22 Unlike the wife in *D.W. v. Bliss*, Williams was the sole owner of the trailer home. Although Williams did not supervise Harris' conduct, dictate with whom he could socialize, or specify whom he could bring to her home, Harris said he understood that she could throw him out of her home and would do so if he did not conform his conduct to that of an adult gentleman. Williams had complete access to the bedroom Harris occupied, which she often cleaned. Williams was at home on three occasions when C.S. was at her home with Harris, including the night C.S. was assaulted. On that night, Harris told Williams C.S. was spending the night, and he and C.S. went into Harris' bedroom.

¶ 23 Although Williams had control over her house, like the circumstances in *Doe v. Goff*, Williams had no knowledge that Harris had the propensity to be a child molester. Plaintiff concedes that Williams had no knowledge about Harris' propensity to sexually assault minors and had no knowledge that he had, in fact, done so. Harris had no criminal record prior to the assault on C.S. and no known incidents of any inappropriate behavior while growing up or while he served in the military. In fact, his military record showed numerous commendations, and he was issued an honorable discharge. He was gainfully employed. Williams had no particular knowledge that would make her cautious about Harris such that she could reasonably foresee harm by Harris to C.S.

¶ 24 As discussed in *Wofford* and *Lockhart*, the defendant has to have some knowledge about a threat of harm the third person may pose to another under the circumstances that gives rise to a duty to control the actions of that third person. The duty extends to such persons who are reasonably and foreseeably put in danger by the defendant's act or omission as to the control of the third person's conduct. As stated in *Doe v. Goff*, foreseeability requires that there be something objectively reasonable to expect, not simply what might conceivably occur.

¶ 25 In hind-sight, Williams' failure to intervene, to even ask a question of C.S. or Harris about the presence of C.S. in her home, in Harris' bedroom, may have created a risk which harmed C.S. *Henry v. Merck*, 877 F.2d at 1492. Absent a duty to C.S., however, she has no actionable liability for the intentional, criminal acts of her grandson, because on the evening of December 27, 2001, she had no reason to know he would engage in such conduct. She knew he kept swords in his room, and perhaps knew he kept a gun in his room. Williams might even have known about one other minor whom Harris brought to her home. These facts still gave Williams no objective reason to expect that Harris might be a child molester and a danger to C.S.

¶ 26 We, therefore, find that Williams did not stand in any special relationship with Harris that would impose a duty on her to warn C.S. about a possible harm Harris posed to C.S., nor did she have a duty to control the actions of Harris because of a threat he foreseeably posed to C.S. The trial court, therefore, erroneously denied Williams' Motion for Judgment Notwithstanding the Verdict.

### CONCLUSION

¶ 27 For these reasons, we reverse that part of the May 27, 2007, Journal Entry of Judgment as against Williams, the August 3, 2007, order denying her Motion for Judgment Notwithstanding the Verdict, and the August 3, 2007, order granting costs and interest against Williams. We remand for entry of judgment in her favor.

¶ 28 **REVERSED AND REMANDED WITH DIRECTIONS.**

WISEMAN, V.C.J., and GOODMAN, J., concur.