NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-2805-14T2

POLIFLY GAS, INC.,
GURINDER SINGH1 and
RUPINDER SINGH,

 Plaintiffs-Appellants,

v.

HAROLD G. SCHRADER, JR.
and RHEA SCHRADER,

 Defendants-Respondents.

____________________________________________

 Argued on October 13, 2016 – Decided June 14, 2017

 Before Judges Simonelli, Carroll and Gooden
 Brown.

 On appeal from the Superior Court of New
 Jersey, Law Division, Bergen County, Docket
 No. L-5472-13.

 Paul S. Doherty, III, argued the cause for
 appellants (Hartmann Doherty Rosa Berman &
 Bulbulia, LLC, attorneys; Mr. Doherty and
 Robin D. Fineman, on the briefs).

 Jeffrey C. Mason argued the cause for
 respondents.

1
 Gurinder Singh alternately appears as Gurinderjit Singh in the
record.
PER CURIAM

 Polifly Gas, Inc., Gurinder Singh and Rupinder Singh

(collectively, plaintiffs) appeal from the January 9 and June 3,

2015 Law Division orders dismissing their complaint with prejudice

pursuant to Rule 4:6-2(e) and denying their motion for leave to

amend the complaint. Plaintiffs argue that "the trial court failed

to follow the standard of review on a motion to dismiss and instead

looked beyond the face of the [c]omplaint to consider questions

of fact that were not properly before the court." Plaintiffs

assert that in so doing, the court "improperly resolved multiple

issues of fact before any discovery had been completed." We agree

and reverse.

 I.

 The dispute stems from the sale of a Hackensack gas station

located at 150 Polifly Road (hereinafter, the property). The

owners of the gas station, defendants Harold and Rhea Schrader,

entered into an agreement on October 25, 2011, to sell the property

to plaintiffs for $1.5 million. Defendants agreed to finance $1.1

million of the purchase price. When the contract was signed,

there were four underground storage tanks (USTs) on the property

that played a prominent role in the operation of the gas station.

The closing took place on January 18, 2012.

 2 A-2805-14T2
 Shortly after the closing, plaintiffs discovered that a

number of the USTs had an interstitial breach of their outer hulls.

The tanks are designed with two containers, an inner steel drum

and an outer fiberglass drum to prevent petroleum from seeping

into the surrounding soil and groundwater. An interstitial breach

occurs when a crack or hole forms in the outer container, leading

to water accumulating in the interstitial region. As a result of

the breach, the station was closed in order to replace the damaged

tanks, causing plaintiffs to lose business and incur other

expenses.

 On July 15, 2013, plaintiffs filed a three-count complaint

against defendants alleging fraud, equitable fraud, and

negligence, respectively, and seeking compensatory and punitive

damages or reformation of the contract of sale. In count one,

plaintiffs alleged that defendants were aware of the interstitial

breaches and the tank monitoring system records confirming the

breaches; defendants knowingly concealed the information from

plaintiffs in the negotiation, agreement and sale of the property;

plaintiffs relied on defendants' false representations of the

condition of the USTs; and plaintiffs suffered damages as a result.

In count two, plaintiffs alleged that, in the event defendants

were unaware of the interstitial breaches, then defendants were

 3 A-2805-14T2
liable to plaintiffs for equitable fraud for the damages plaintiffs

suffered.

 In count three, plaintiffs alleged that, by statute and

operation of law, defendants "were under a duty to use reasonable

care in the inspection, maintenance and monitoring of the UST

systems[.]" However, defendants "negligently, carelessly and

recklessly failed and neglected to adopt proper monitoring of the

USTs in question, failed to have proper maintenance and monitoring

via cathodic device and otherwise, and failed in general to

ascertain the breaches" of the outer hulls. According to

plaintiffs, "[a]s a direct and proximate result" of defendants'

"negligence, carelessness and recklessness[,]" plaintiffs suffered

damages.

 In response to plaintiffs' complaint, on October 9, 2014,

defendants filed a motion to dismiss pursuant to Rule 4:6-2(e) for

failure to state a claim upon which relief may be granted. To

support the motion, defendants submitted the certification of

defendant Rhea Schrader (Ms. Schrader) and appended a copy of the

contract of sale. Ms. Schrader certified that during the

negotiations, plaintiffs "were made aware that the property was

the subject of an [ongoing] environmental remediation and

monitoring (clean-up), with the New Jersey Department of

Environmental Protection (NJDEP) under case no. 08-10-13-1651-

 4 A-2805-14T2
15[.]" Ms. Schrader averred that plaintiffs were also made aware

that, if the business was not sold, defendants were "planning to

install new [USTs] at the station to replace and upgrade the

existing USTs, within the upcoming months." Further, Ms. Schrader

certified that plaintiffs proceeded with the purchase aware of

"the clean-up and the required installation of new USTs[,]" both

of which were expressly provided for in the terms of the contract,

whereby plaintiffs agreed to assume and undertake responsibility

for both at their cost and expense.

 According to Ms. Schrader, Section 8 of the contract, entitled

"Purchaser's Covenants[,]" provided in pertinent part that:

 Purchasers have secured the services of a
 licensed environmental consultant to prepare
 and execute a plan to remediate soil and
 groundwater contamination under NJDEP case
 number 08-10-13-1651-15, and Purchasers will
 submit a remediation certification with the
 NJDEP, for remediation and will diligently
 pursue and obtain a No Further Action letter
 (NFA) or its equivalent as to soils and
 groundwater from the NJDEP for the subject
 case and will endeavor to perform all required
 work to deliver same to Sellers within five
 years, post-closing.

Section 24 of the contract, entitled "Purchasers'

Representations[,]" provided in pertinent part that:

 C. The purchasers shall buy and install [two]
 new USTs at the premises, at purchasers' cost,
 within five (5) years of closing.

 5 A-2805-14T2
 D. The purchasers are experienced in the
 gasoline service station business and have the
 expertise and sufficient capital to
 competently operate the business assets that
 are the subject of this sale.

 Ms. Schrader averred further that the contract provided

plaintiffs with a due diligence period until October 14, 2011, "to

investigate the property, the NJDEP case history . . . and all

aspects of the business and its equipment and operation, including

the USTs," in order to decide whether to go forward with the

purchase. Ms. Schrader certified that in conjunction with

affording plaintiffs the "unfettered right to cancel the agreement

under the due diligence provision," section 16 of the contract,

entitled "'As Is' Sale; Risk of Loss; Condition of Subject

Premises[,]" provided that:

 Purchasers acknowledge that [p]urchasers have
 fully and thoroughly inspected and examined
 the [s]ubject [p]remises, the fixtures
 appurtenant to same and that [p]urchasers
 shall accept same in "[a]s [i]s" condition and
 "[w]ith [a]ll [f]aults" as of the date hereof
 and the [c]losing. Sellers disclaim all
 warranties, express or implied, as to any
 defects, patent or latent.

 A. Sellers make[] no representations as
 to the (i) structural condition of the roofs,
 floors, walls or any other part of the
 [s]ubject [p]remises, (ii) the systems in or
 affecting the [s]ubject [p]remises[,] (iii)
 the environmental condition of the [s]ubject
 [p]remises, except that sellers have delivered
 all environmental reports in their possession
 to purchasers, (iv) any other matter relating

 6 A-2805-14T2
 to or affecting the structural or non-
 structural condition of the [s]ubject
 [p]remises and the fixtures appurtenant to
 same. Purchasers hereby unconditionally and
 irrevocably waive and release any and all
 actual and potential rights [p]urchasers may
 have regarding any warranty, express or
 implied, of any type or kind, relating to the
 property, such waiver and release being
 absolute, unconditional, irrevocable,
 complete, total and unlimited in any way.
 This waiver and release includes but is not
 limited to a waiver and release of express
 warranties, implied warranties, warranties
 for a particular use, warranties of
 merchantability, warranties of habitability,
 strict liability rights and claims of every
 kind and type including but not limited to
 product liability type claims and all rights
 and claims relating to or attributable to
 environmental conditions on or emanating from
 the property. This provision shall survive
 the closing of title.

 B. This [a]greement is entered into with
 [p]urchasers' full knowledge as to the value
 of the [s]ubject [p]remises and not upon any
 representations as to the value, character,
 quality or condition thereof, their fitness
 for any particular use, the collectability of
 rents, issues and profits thereof and except
 as otherwise explicitly stated herein,
 [s]ellers make[] no representations with
 respect thereto and assumes no responsibility
 or liability with respect to or account of any
 condition which may exist.

 In addition, according to Ms. Schrader, section 23 of the

contract, entitled "Sellers' Representation[,]" specified

defendants' representations relating to the environmental

condition of the property and the USTs as follows:

 7 A-2805-14T2
 C. UST Project: Sellers shall supply [two]
 MPDs and computer system to purchasers at no
 additional cost. (Purchasers to buy and
 install [two] new UST's and install the MPDs
 at purchasers' cost).

 D. Environmental Reports. Sellers make no
 representations with respect to the
 environmental condition of the [s]ubject
 [p]remises except as contained in any
 environmental reports of sellers'
 environmental consultants supplied to
 purchasers. Sellers shall have no liability
 to [p]urchasers for any claims by the
 [p]urchasers or third parties based on the
 presence of [h]azardous [s]ubstances, at,
 under or on the [s]ubject premises.

Ms. Schrader certified that plaintiffs "investigated the property

and the business with the assistance of legal counsel and their

environmental consultant" and "did not exercise their right to

cancel the [c]ontract under the due diligence clause" but instead

"went forward with the purchase" and "agreed to an unconditional

and irrevocable waiver and release of claims 'of every kind and

type[.]'"

 In opposing defendants' motion to dismiss, plaintiffs

submitted a certification in which plaintiff Gurinderjit Singh

(Mr. Singh) averred that plaintiffs purchased the property relying

on "the accuracy of the information" contained in "various

environmental reports and system print outs" provided by

defendants as well as defendants' oral representations that "the

only remediation remaining was to the [groundwater]." However,

 8 A-2805-14T2
Mr. Singh certified that he "discovered after the purchase that

of the four (4) USTs on the site at the time of purchase, three

(3) had breaches in their outer hull, otherwise called interstitial

breaches" which rendered "the tanks unusable in the eyes of the

New Jersey DEP." Mr. Singh asserted that although he "had agreed

to replace the USTs over a five (5) year period from the date of

closing[,]" since the interstitial breach prevented the tanks from

being utilized, the DEP "shut down the station completely for over

four months[,]" and the remediation became "greater than that

which was represented to [plaintiffs] at the time of the

negotiation of the contract."

 According to Mr. Singh, although "all of the USTs were

monitored by a Veeder Root tank monitoring system which immediately

sounds an alarm when [an] interstitial breach occurs" and generates

"a written printout of the breach[,]" he "was advised after the

closing by the DEP that the underground probe that detects outer

hull breaches had been removed from the Veeder Root system" and

the system was "tampered with" to "indicate that all systems were

operating normally." Mr. Singh certified that although the breach

existed prior to the sale and "the alarm from the Veeder Root

system should have sounded," defendants concealed the breach by

removing the alarm monitor "from the USTs, to prevent the Veeder

Root system from sounding an alarm" during his examination of the

 9 A-2805-14T2
tanks. Further, Mr. Singh averred that defendants provided

documents to his environmental reviewer "which contained no Veeder

Root alarms or printouts indicating an interstitial breach."

 In a reply certification, Ms. Schrader disputed plaintiffs'

claims. Ms. Schrader averred that the "UST reports supplied to

plaintiffs in September 2011 included UST tank testing results

performed by ATS Environmental Services" (ATS), disclosing water

in the interstitial cavity of all the gasoline tanks, as well as

the July 27, 2011 summary report performed by T. Slack

Environmental Services (TSES), the company hired by defendants to

assist them with DEP compliance, recommending against invasive

remediation until "the final disposition of the existing tanks."

Ms. Schrader also denied any alteration to the tank monitoring

system and certified that the property "had the Incon UST

monitoring system and not the Veeder Root system."

 According to Ms. Schrader, the Incon system provides "data

about the operation of the USTs through the generation of Automatic

Tank Gauge [ATG] [r]eports" which "relate to the integrity of the

tank walls and the intrusion of water into the tank." Ms. Schrader

certified that the ATG weekly reports, which are maintained on the

premises "at all times" for DEP inspections and are "required to

maintain UST insurance[,]" were provided to plaintiffs in order

to obtain new UST insurance. In addition, Ms. Schrader asserted

 10 A-2805-14T2
that the necessity for UST upgrades was specifically contemplated

in the negotiation of the contract, and the scope and cost of the

project were disclosed to plaintiffs by their own environmental

consultant, SSS Construction Company, whose proposal totaled

approximately $246,300, as well as defendants' consultant, T.

Slack Environmental Services, whose proposal totaled approximately

$337,002. Both proposals included the installation of the Veeder

Root system and reserved additional costs for excavation, soil

disposal and removal of contaminated soil.

 On December 5, 2014, following oral argument, the court ruled

as follows:

 It's obvious to this [c]ourt from the
 exhibits that are provided . . . that there
 was disclosure to [plaintiffs] that there were
 problems here and things had to be done.

 And they had full access to the NJ DEP
 files and they hired their own individuals to
 review the situation. The . . . allegation
 that somehow there was a fraud and just to say
 there's a fraud, I mean, at this point there
 should be something that you have to show that
 there was a fraud perpetrated on your client
 by . . . something.

 I mean, I can't remember seeing something
 with such full disclosure at a time of a
 closing having to do with an environmental
 matter as this, having to do with the sale of
 the property. I'm going to be granting the
 application.

 11 A-2805-14T2
 In response to plaintiffs' attorney's inquiry whether the

motion was "being granted as a summary judgment . . . as opposed

to a dismissal under Rule 4:6-2[,]" the court replied:

 I am granting the application to dismiss
 this complaint for all of the reasons set
 forth on the record, not on the basis of
 summary judgment, because summary judgment
 would require a different analysis but based
 upon everything before this [c]ourt, and you
 certainly could have given other documents to
 this [c]ourt.

The following colloquy then ensued:

 [PLAINTIFFS' ATTORNEY]: I'm not allowed to
 respond.

 THE COURT: Okay. I'm not going to have any
 further oral argument today. I'm going to
 give you two weeks to give me a surreply to
 the reply and then I'll determine whether or
 not we're going to have further oral argument.

 . . . .

 [DEFENDANTS' ATTORNEY]: [W]ith respect to the
 materials that were supplied in the
 certification of Ms. Schrader relating to
 matters outside of the complaint and the
 pleading, I believe under any analysis that
 includes Rule 4:6-2 motion to dismiss and Rule
 4:46 motion for summary judgment when matters
 outside of the pleading are presented, and
 it's my apology for not clearly briefing this
 issue, the matter becomes a motion for summary
 judgment and must be analyzed on that basis.

 Because this certification was
 submitted, I would submit to the [c]ourt that
 we would . . . like an opportunity to more
 thoroughly brief that for the [c]ourt's
 benefit.

 12 A-2805-14T2
 THE COURT: Okay.

 Thereafter, in a certification submitted to the court in

opposition to the motion, Mr. Singh certified that the documents

provided by defendants did not constitute proof of an outer hull

breach because such a breach would have required defendants to

promptly cease operations and notify DEP, neither of which

occurred. According to Mr. Singh, had he been advised of an outer

hull breach that required immediate removal and replacement of the

USTs, rather than the five years specified in the contract, he

"would never have proceeded with the closing." In support,

plaintiffs submitted the certification of a purported expert,

Peter A. Ianzano, Jr., who opined that water accumulating "in the

interstitial zone between the inner and outer hulls of a UST is

not proof of an outer hull breach" and can be rectified without

replacing the UST.

 On January 9, 2015, following additional oral argument that

did not address the applicable standard, the court again ruled for

defendants and entered an order dismissing the complaint. The

court viewed the sophistication of the parties and the manner in

which the negotiations progressed as important factors in

evaluating the motion. The court explained:

 [Plaintiffs] are very sophisticated
 purchasers in the field of gas stations. This

 13 A-2805-14T2
is their family business. This is their
business. The negotiated sale price was 1.5
million. [Plaintiffs] requested that the
defendants . . . provide financing of 1.1
million to complete the purchase . . . .

 This is an important factor for the
[c]ourt because clearly the sellers of the
property had an interest in the business being
successful going forward.

 Now [plaintiffs] were unequivocally made
aware that the property was subject of an
ongoing environmental remediation and
monitoring cleanup with the New Jersey DEP
. . . and that H&R, Inc. was planning to
install new underground storage tanks at the
station to replace and upgrade the existing
USTs within upcoming months if the defendants
did not sell the business.

 [Plaintiffs] nonetheless were very
interested in going forward with the purchase
and the facts of the cleanup and the required
installation of the new USTs were expressly
provided for in the terms of the contract,
whereby [plaintiffs] agreed to assume and
undertake responsibility for the cleanup and
to install new USTs, all at [plaintiffs]' cost
and expense.

 . . . .

 The contract provided [plaintiffs] with
a due diligence to investigate the property,
the New Jersey DEP case history, and all
aspects of the business and its equipment and
operation, including the USTs, and to decide
whether or not to go forward with the purchase
or cancel the contract for any reason, in
their complete discretion.

 The contract includes representations
that [plaintiffs] would undertake the cleanup
and install the new USTs and that they had the

 14 A-2805-14T2
 experience and expertise to operate the gas
 station business.

 In rendering its decision, the court relied on the express

terms of the contract, particularly the provision "that the sale

is, 'as is, with all faults, and that the sellers disclaim all

warranties, expressed or implied, as to any defects patent or

latent and make no representation regarding the condition of the

business or the property.'" Further, the court underscored the

provision specifying "an unconditional and irrevocable waiver and

release of sellers from any future claim alleging defects in the

property or business property being sold." The court noted that

plaintiffs "investigated the property and the business with

assistance of legal counsel and their environmental consultant"

and "were satisfied with the business and property and did not

exercise their right to cancel the contract under the due diligence

clause" but instead "continued with the purchase, and proceeded

to schedule a closing."

 Regarding the seller's representations relating to the UST

project and the environmental condition of the property, the court

noted:

 Now the UST report supplied to
 [plaintiffs] in due diligence actually
 disclosed water in the interstitial cavity of
 all gasoline tanks. The September, 2011 due
 diligence package . . . supplied to
 [plaintiffs] included the UST tank testing

 15 A-2805-14T2
 results performed by ATS Environmental
 Services and this [c]ourt has reviewed the
 report, it was attached . . . to Ms. Schrader's
 reply certification, and it states
 specifically there is a 33-inch water in all
 gasoline tank interstitial with sensors pulled
 up.

 Therefore, Mr. Singh knew about the
 condition of the USTs in the course of due
 diligence . . . well in advance of closing.
 It is respectfully submitted . . . that no one
 with his background and experience in the
 operation of gas stations and in this industry
 would buy a gas station without first
 examining the UST reports required under state
 regulations.

 The September, 2011 due diligence package
 . . . supplied to the purchaser included the
 summary report of groundwater investigation
 requirements . . . performed by T. Slack
 Environmental Services dated July 27, 2011.

 The TSES summary report concludes any
 further remediation plans will depend upon the
 final disposition of the existing tanks.
 Until this is determined, TSES does not
 recommend any invasive remediation.

 He understood the significance of the ATS
 tank testing report and the TSES summary
 report supplied to him in the course of due
 diligence. What was clear is the UST project
 was necessary and the final cost of
 remediation was unknown.

 Regarding plaintiffs' allegations that the Veeder Root

monitoring system was tampered with, the court found:

 Now the station had the icon TS-1000 UST
 monitoring system, not the [Veeder Root]
 monitoring system, as is suggested by all of
 the papers submitted by the plaintiff.

 16 A-2805-14T2
 Mr. Singh was not misled by any
 fraudulent altering of the [Veeder Root] tank
 monitoring system and had all of the
 documentation that has been provided to the
 [c]ourt and nonetheless he still chose to go
 forward with this purchase under the
 conditions clearly set forth in the contract.

The court also determined that

 [T]he scope and cost of the UST upgrade
 was disclosed to Mr. Singh in the course of
 due diligence by Singh's own environmental
 consultant, who proposed an installation of
 the [Veeder Root] system.

 He was unequivocally aware the entire UST
 project involved removal of soils from the
 property, the final volume of which could not
 be determined, and Mr. Singh elected to
 purchase.

The court concluded:

 Accordingly, there is no basis for
 plaintiff's complaint. There is no
 contractual fraud. There is no equitable
 fraud. And no further discovery will change
 the facts of what he clearly knew, what he was
 allowed to investigate, what his own attorney,
 what his own consultants advised him, what he
 himself knew as being a professional in the
 industry, and all of the disclosures the
 [c]ourt has been able to review and that Mr.
 Singh and his professionals had in their
 possession.

 Plaintiffs then moved for clarification on whether or not the

dismissal was with prejudice or without, and to amend their

complaint to include breach of contract and breach of implied duty

of good faith counts. Those counts alleged that the environmental

 17 A-2805-14T2
reports provided by defendants, including the April 27, 2011 ATS

Report, falsely represented the condition of the USTs. It was

alleged that those false representations breached the provision

of the contract in which defendants represented that the

information contained in the environmental reports were true and

accurate and breached the implied covenant of good faith and fair

dealing inherent in the contract. On June 3, 2015, the court

clarified that the complaint was dismissed with prejudice and

denied plaintiffs' motion to amend the complaint. This appeal

followed.

 II.

 We review a decision to dismiss a complaint as a matter of

law under Rule 4:6-2(e) de novo, using the same standards relied

on by the motion judge. Assuming arguendo that the facts stated

within the four corners of the complaint are true, and granting

plaintiff the benefit of all rational inferences that can be drawn

from such facts, we must determine:

 whether a cause of action is "suggested" by
 the facts. In reviewing a complaint dismissed
 under Rule 4:6-2(e) our inquiry is limited to
 examining the legal sufficiency of the facts
 alleged on the face of the complaint.
 However, a reviewing court "searches the
 complaint in depth and with liberality to
 ascertain whether the fundament of a cause of
 action may be gleaned even from an obscure
 statement of claim, opportunity being given
 to amend if necessary." At this preliminary

 18 A-2805-14T2
 stage of the litigation the Court is not
 concerned with the ability of plaintiffs to
 prove the allegation contained in the
 complaint. For purposes of analysis
 plaintiffs are entitled to every reasonable
 inference of fact. The examination of a
 complaint's allegations of fact required by
 the aforestated principles should be one that
 is at once painstaking and undertaken with a
 generous and hospitable approach.

 [Printing Mart-Morristown v. Sharp Elecs.
 Corp., 116 N.J. 739, 746 (1989) (citations
 omitted).]

 Thus, a motion to dismiss under Rule 4:6-2(e) "must be based

on the pleadings themselves." Roa v. Roa, 200 N.J. 555, 562

(2010). For purposes of such a motion, the "complaint" includes

the "'exhibits attached to the complaint, matters of public record,

and documents that form the basis of a claim.'" Banco Popular N.

Am. v. Gandi, 184 N.J. 161, 183 (2005) (quoting Lum v. Bank of

Am., 361 F.3d 217, 222 n.3 (3d Cir.), cert. denied, 543 U.S. 918,

125 S. Ct. 271, 160 L. Ed. 2d 203 (2004)). However,

 If . . . matters outside the pleading are
 presented to and not excluded by the court,
 the motion shall be treated as one for summary
 judgment and disposed of as provided by R.
 4:46, and all parties shall be given
 reasonable opportunity to present all material
 pertinent to such a motion.

 [R. 4:6-2].

 Here, the court clearly looked outside the pleadings and went

far beyond the four corners of the complaint when it considered

 19 A-2805-14T2
the factual and procedural history of the dispute between the

parties. In fact, the court afforded the parties the opportunity

to present additional materials pertinent to the motion. In so

doing, the court converted the Rule 4:6-2(e) motion into a Rule

4:46 summary judgment motion. Pressler, Current N.J. Court Rules,

comment 4.1.2. on R. 4:6-2 (2017); see also Roa, supra, 200 N.J.

at 562. However, the court expressly found "no basis for

plaintiff's complaint" and dismissed the complaint for failure to

state a claim upon which relief can be granted and "not on the

basis of summary judgment, because summary judgment would require

a different analysis[,]" one in which the court did not engage.

 That said, because the court purportedly dismissed

plaintiffs' complaint pursuant to Rule 4:6-2(e), we consider

whether the complaint is capable of withstanding dismissal

pursuant to a proper application of that rule. In dismissing the

complaint, the court rejected plaintiffs' claims based on its

evaluation of conflicting certifications and its determination

that plaintiffs were unable to prove their allegations. However,

at this stage in the proceeding, in determining whether dismissal

under Rule 4:6-2(e) was warranted, the court should not concern

itself with plaintiffs' ability to prove their allegations.

Printing Mart-Morristown, supra, 116 N.J. at 746.

 20 A-2805-14T2
 Rather, the court's focus should have been whether plaintiffs

alleged sufficient facts that, if proven, would establish fraud,

the elements of which are: "(1) a material misrepresentation of a

presently existing or past fact; (2) knowledge or belief by the

defendant of its falsity; (3) an intention that the other person

rely on it; (4) reasonable reliance thereon by the other person;

and (5) resulting damages." Gennari v. Weichert Co. Realtors, 148

N.J. 582, 610 (1997) (citing Jewish Ctr. of Sussex Cnty. v. Whale,

86 N.J. 619, 624-25 (1981)). Moreover, in order to prove equitable

fraud, "[t]he elements of scienter, that is, knowledge of the

falsity and an intention to obtain an undue advantage therefrom

. . . are not essential[.]" Jewish Ctr. of Sussex Cnty., supra,

86 N.J. at 625 (citation omitted).

 To sue for negligence, a plaintiff need only allege facts to

show that "a defendant owed a duty of care, the defendant breached

that duty, and injury was proximately caused by the breach."

Siddons v. Cook, 382 N.J. Super. 1, 13 (App. Div. 2005).

Foreseeability of the risk of harm is the foundational "fact-

specific" element in the determination of whether a duty exists.

Williamson v. Waldman, 150 N.J. 232, 239 (1997); Hopkins v. Fox &

Lazo Realtors, 132 N.J. 426, 439 (1993). As such, defendants are

considered to have a duty if in a position to discover the risk,

 21 A-2805-14T2
or would have reason to know that plaintiffs would suffer a

particular injury. J.S. v. R.T.H., 155 N.J. 330, 337-38 (1998).

 To further compound the error, although "dismissals pursuant

to Rule 4:6-2(e) should ordinarily be without prejudice and . . .

plaintiffs generally should be permitted to file an amended

complaint[,]" Nostrame v. Santiago, 213 N.J. 109, 128 (2013), the

court dismissed the complaint with prejudice without giving

plaintiffs an opportunity to amend. From our review, we are

satisfied that the court considered documents well beyond the four

corners of plaintiffs' complaint in deciding the motion. Because

the court did not convert the motion into a Rule 4:46 motion for

summary judgment or apply the appropriate standard for a Rule 4:6-

2(e) motion, we are constrained to reverse and remand. We do not

offer any opinion on the merits of any of plaintiffs' claims and,

on remand, defendants may assert any and all defenses and may file

the appropriate application anew.

 Reversed and remanded for further proceedings consistent with

this opinion. We do not retain jurisdiction.

 22 A-2805-14T2